TWELVE JOHN DOES, et al.

v.

DISTRICT OF COLUMBIA, et al.

Appeal of Edwin A. MEESE, III, Attorney General of the United States.

No. 87–5254.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 25, 1987.

Decided March 11, 1988.

As Amended March 28, 1988.

John D. Bates, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, John Oliver Birch, John M. Facciola, and Bradley L. Kelly,

Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant.

Peter J. Nickles, with whom Alan A. Pemberton and John F. Seymour, Washington, D.C., were on the brief, for appellees, Twelve John Does, et al.

Edward E. Schwab, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Acting Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, Lutz Alexander Prager, Asst. Deputy Corp. Counsel, and Michael E. Zielinski, Trial Asst., Corp. Counsel, Washington, D.C., were on the brief, for appellee, District of Columbia.

Before RUTH BADER GINSBURG, D.H. GINSBURG, Circuit Judges, and ROBINSON,* Chief Judge.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The Attorney General of the United States appeals from (1) a district court order reinstating him in this case, from which he had been dismissed as a defendant in 1980, and from (2) a preliminary injunction barring him from designating District of Columbia prisons as the place of confinement for prisoners convicted under the laws of the District in D.C. Superior Court. 668 F.Supp. 20.

The Attorney General was originally named as a defendant not only in this case, in which appellees challenge the constitutionality of the conditions in one of the prisons maintained by the District, but also in one of two other cases consolidated with it before the district court. Each of the three cases raises a similar challenge to one or more of the various D.C. prison facilities. The district court dismissed the Attorney General from both cases in which he had been named as a defendant, and the

remaining parties thereafter negotiated consent decrees governing conditions at the prisons.

After the District had repeatedly violated the population limits imposed by the consent decrees, the district court granted appellees' motions to reinstate the Attorney General pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and to issue the preliminary injunction. Because we find that the district court improperly reinstated the Attorney General, we reverse.

## I. BACKGROUND

This appeal is only the most recent chapter in the long history of litigation over the problem of overcrowding at the District of Columbia's prison facilities. Three civil actions, each involving a separate facility at the District's prison complex in Lorton, Virginia, are consolidated before the district court:[1] *John Doe v. District of Columbia*, No. 79–1726 (D.D.C.), was filed on behalf of inmates at the District's Maximum Security Institution ("Maximum"); *Twelve John Does v. District of Columbia*, No. 80–2136 (D.D.C.), involves prisoners at the Lorton Central facility ("Central"); and *Inmates of Occoquan v. Barry*, 650 F.Supp. 619 (D.D.C.1986), *appealed docketed*, No. 87–5055 (D.C.Cir. Jan. 14, 1988), was brought by inmates at the District's three Occoquan facilities ("Occoquan"). We will sketch only briefly the tortuous history of these cases, mentioning only the events that bear upon the disposition of this appeal.

The complaint in *John Doe*, which was filed in 1979, alleged that prisoners at Maximum were exposed to "unchecked violence" and a "pervasive risk of harm" as a result of improper prisoner classification, an inadequate and unqualified prison staff, and insufficient security measures that allowed inmates access to weapons, drugs,

---

* The Honorable Aubrey E. Robinson Jr., Chief Judge of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1982).

1. Two other cases, *Inmates of the D.C. Jail v. Jackson*, No. 75–1668 (D.D.C.), and *Campbell v. McGruder*, No. 77–1462 (D.D.C.), involve prisoner challenges to conditions at the District's Central Detention Facility (the "D.C. Jail"), which is located in the District of Columbia. They were consolidated separately from the cases on appeal here, and resulted in a consent decree imposing limits on the D.C. Jail's population and in a stipulation requiring other reforms. The district court continues to monitor those arrangements.

and alcohol. The prisoners maintained that these conditions violated their right under the Eighth Amendment of the Constitution to be free from cruel and unusual punishment. Because section 24–425 of the D.C. Code commits all prisoners convicted in the District to the custody of the Attorney General, and provides that he is to designate their places of confinement, the *John Doe* inmates also named the Attorney General as a defendant, alleging that he had failed to confine them in an "available, suitable, and appropriate" institution as required by the statute.[2] The complaint, which sought damages and injunctive relief, also named the District and various District officials as defendants.

The Attorney General immediately moved to be dismissed from the case on the grounds that he was immune from a suit for damages and that his duties under section 24–425 were purely technical. Shortly thereafter, in September of 1979, the district court granted his motion to dismiss. Plaintiffs did not seek certification of the court's order under Fed.R.Civ.P. 54(b), which would have allowed them immediately to appeal the dismissal of the Attorney General.

Less than a year later, in August of 1980, inmates housed at Central filed the complaint in *Twelve John Does*. They sought damages, injunctive relief, and a declaration that a number of prison conditions, including overcrowding, violated their Eighth Amendment rights; and like the *John Doe* plaintiffs, they sued not only the District and several District officials, but also the Attorney General, claiming that he had violated section 24–425 by failing to assign them to a suitable and appropriate institution.

In November of 1980, the Attorney General moved to be dismissed from *Twelve John Does*, advancing essentially the same arguments he had made in the earlier case. The plaintiffs filed an opposition, arguing that in order to remedy overcrowding, the Attorney General might be ordered to cease committing prisoners to Central pursuant to section 24–425. As in *John Doe*, however, the district court dismissed the Attorney General as a defendant; these plaintiffs, too, failed to request Rule 54(b) certification of the dismissal.

Following months of discovery and negotiation in both cases, and a trial and an appeal in *John Doe*, plaintiffs in both suits separately entered into consent decrees with the District. The consent decrees, which the district court approved in *Twelve John Does* in April 1982 and in *John Doe* in March 1984, require the District to undertake numerous specific reforms designed to improve prison conditions. Significantly, they also establish specific population limits for each facility—1166 inmates for Central and 536 for Maximum. The consent decree in *Twelve John Does*, moreover, explicitly recognizes that all its elements "rest fundamentally on the number of residents committed to the Central Facility."

Unfortunately, the consent decrees did not mark the end of this litigation. The district court's efforts over the last five years to monitor the decrees have been almost continually hampered by the failure of the District to abide by the terms of the decrees. The District has achieved only modest success in expanding the capacity of its prison system and in improving conditions at its current facilities. Until recently, however, the District had at least gener-

2. D.C.Code Ann. § 24–425 (1981) provides:

All prisoners convicted in the District of Columbia for any offense, including violations of municipal regulations and ordinances and acts of Congress in the nature of municipal regulations and ordinances, shall be committed, for their terms of imprisonment, and to such types of institutions as the court may direct, to the custody of the Attorney General of the United States or his authorized representative, who shall designate the places of confinements where the sentences of all such persons shall be served. The Attorney Gener-

al may designate any available, suitable, and appropriate institutions, whether maintained by the District of Columbia government, the federal government, or otherwise, or whether within or without the District of Columbia. The Attorney General is also authorized to order the transfer of any such person from one institution to another if, in his judgment, it shall be for the well-being of the prisoner or relieve overcrowding or unhealthful conditions in the institutions where such prisoner is confined, or for other reasons.

ally complied with the population limits imposed by the consent decrees. As the Honorable John D. Fauntleroy, a retired Judge of the D.C. Superior Court appointed to oversee the *Twelve John Does* decree, reported to the court in July, 1986, the District had managed to comply with the population limit at Central only by diverting inmates to the few D.C. prison facilities, such as Occoquan, that were not under court-imposed ceilings, which had the effect of overcrowding those facilities.

Less than ten days after Judge Fauntleroy issued his report, inmates at Occoquan rioted. In the aftermath of this disturbance, the Attorney General, who had recently accepted into federal prisons almost 1600 prisoners convicted of D.C. offenses, agreed to take roughly 300 more District inmates into federal facilities, and the inmates of Occoquan filed their case. Unlike the plaintiffs in *John Doe* and *Twelve John Does*, however, the *Inmates of Occoquan* plaintiffs did not name the Attorney General as a defendant, but sought relief solely from the District and its officials. The district court consolidated *Inmates of Occoquan* with *John Doe* and *Twelve John Does* in order to "address the prison overcrowding issue as a whole." After a full trial, the district court held that the conditions at the Occoquan facilities violated the inmates' Eighth Amendment rights, and ordered, among other things, that the District reduce to 1,281 the combined number of inmates at the three Occoquan facilities by June 1, 1987. *Inmates of Occoquan,* 650 F.Supp. at 634.

As the June 1 deadline approached, however, it became apparent that the District would violate the Occoquan population limit; and on May 20, 1987, the district court stayed the deadline and asked Judge Fauntleroy to recommend further means by which the overcrowding problem could be addressed. The population at Occoquan continued to swell over the course of the summer, and on July 20 peaked at 1,954, or more than 600 inmates over the population limit imposed by the district court. On July 13, the District notified counsel for the Central inmates that, because of transfers from Occoquan, the population cap on Central imposed by the *Twelve John Does* consent decree had also been exceeded.

Three days later, plaintiffs in *Twelve John Does* filed an Emergency Motion Pursuant to Fed.R.Civ.P. 60(b) for Leave to Join the Attorney General as an Additional Defendant, and for Leave to File a Supplemental Complaint, along with motions seeking contempt sanctions against the District and temporary and preliminary injunctive relief against the Attorney General. The supplemental complaint alleged that the overcrowding at Central was at least in part the fault of the Attorney General, who concededly had the power to designate federal prisons as the places of confinement for D.C. prisoners, but who continued to assign them to District prisons that were not "suitable and appropriate institutions" within the meaning of section 24–425. Later, that same day, the district court, after denying the Attorney General's request to respond to the motions, vacated its 1980 order of dismissal, and granted the motion to reinstate him in the case. On July 21, the District moved to join the Attorney General as a party in the *Inmates of Occoquan* case, and sought a preliminary injunction to prevent the Attorney General from continuing to designate prisoners to the D.C. prison system. Plaintiffs in that case, however, opposed not only the joinder of the Attorney General and the preliminary injunction sought by the District, but also the reinstatement of the Attorney General in *Twelve John Does.* Instead, they filed a motion to enforce the population cap of 1,281. The district court has not yet ruled on the District's motion for joinder and a preliminary injunction in *Inmates of Occoquan.* On July 30, however, the district court imposed a civil contempt sanction against the District in *Twelve John Does,* and granted plaintiffs' motion to enforce the decree in *Inmates of Occoquan* by requiring the District to achieve a staged reduction of 100 inmates per month at those facilities.

The following day, the district court issued the preliminary injunction in *Twelve John Does* that is the subject of this appeal. In that order, the court enjoined the

Attorney General from designating any of the Lorton facilities as the place of confinement for additional District of Columbia prisoners until the court should determine that those facilities "are again available, suitable and appropriate facilities within the meaning of D.C.Code § 24–425." [3] In an accompanying opinion, the court concluded that plaintiffs were likely to prevail on the merits of their claim against the Attorney General, relying in part on an affidavit filed by Hallem Williams, the Director of the D.C. Department of Corrections. Mr. Williams stated in the affidavit that "no additional prisoners could be placed into those institutions which were not subject to judicially imposed limits" and that after personal inspection of the Lorton facilities, it was his "considered opinion" that those facilities were "not suitable or appropriate for the housing of additional prisoners." In balancing the hardship that granting the injunction would impose on the federal prison system against the hardship that denying the injunction would leave with the inmates at Lorton, the district court recognized that it was "faced with a 'no-win' situation." Ultimately, however, the court held that the balance of harms favored plaintiffs, since, while "overcrowding [is] also plaguing the federal system [it] is clearly not faced with the crisis state in which [the District of Columbia Department of Corrections] finds itself."

In a separate memorandum opinion issued the same day, the district court also denied the Attorney General's motion to reconsider the July 16 order rejoining him as a defendant in the case. The court stated that "[a]t the inception of this case in 1980, population issues were peripheral to the central issues of safety and security raised in the complaint. Today, the chronic overcrowding plaguing all of the Lorton facilities has rendered all other issues academic.... This overcrowding is an entirely new development in this litigation...." Because it believed that the dismissal of

the Attorney General would otherwise continue to have the inequitable "prospective effect" of precluding renewal of the plaintiffs' claim against him notwithstanding these changed circumstances, the court, refused to reconsider its July 16 order reinstating him in the case pursuant to Rule 60(b).

The Attorney General moved in this court for an emergency stay pending appeal and for summary reversal, and we entered a temporary administrative stay to permit time for full consideration of the motions. Following further briefing, on August 11 a motions panel of this court denied the Attorney General's motion for summary reversal, but entered a stay pending resolution of this appeal.

## II. Issues

The Attorney General raises several challenges on appeal. First, he argues that the district court improperly applied Rule 60(b) to reinstate him as a party in *Twelve John Does*. Second, he asserts that in light of the opposition of the *Inmates of Occoquan* plaintiffs to his joinder in that case, and because he was rejoined as a defendant only in *Twelve John Does*, the district court abused its discretion by entering an injunction barring him from designating D.C. prisoners not only to the Central facility involved in that case, but to any of the District's Lorton facilities.

The Attorney General also argues that the district court's preliminary injunction is based on a fundamental misreading of section 24–425. The language and history of that provision, he claims, show that Congress intended that the District be responsible for housing its own prisoners; and judicial decisions, he avers, recognize in the Attorney General an unlimited discretion to designate the places of confinement for prisoners, unfettered by judicial review. Subsidiarily, he argues that even if his designation decisions are reviewable, in view of the substantial overcrowding in the

---

**3.** The district court's order did not bar designation to Lorton of prisoners who had outstanding or open charges against them, or of inmates sentenced under either the D.C. Youth Rehabili-

tation Amendment Act of 1985, D.C.Code Ann. §§ 24–801 to 807 (Supp.1987), or the D.C. Work Release Act, D.C.Code Ann. §§ 24–461 to 469 (1981).

federal prison system and the District's persistent failure to increase the capacity of its own prison facilities, the court erred in finding that he was unreasonable in continuing to assign D.C. prisoners into the District's prison system. Finally, he argues that the district court erroneously evaluated the balance of harms in this case, inasmuch as the federal prison system is 56% over its rated capacity, whereas Central, the prison involved in *Twelve John Does* (the only suit to which he is a party), is only about 4% over its rated capacity.

Because we find, contrary to the district court, that Rule 60(b) does not provide a proper basis for the reinstatement of the Attorney General, we do not address the other issues raised by his appeal.[4]

### III. ANALYSIS

■ Rule 60(b) provides that "upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding" for any of several specified reasons. Regardless of the particular reason for providing such relief, however, under Rule 60(b) the trial judge must strike a " 'delicate balance between the sanctity of final judgments ... and the incessant command of a court's conscience that justice be done in light of *all* the facts.' " *Good Luck Nursing Home, Inc. v. Harris,* 636 F.2d 572, 577 (D.C.Cir.1980) (quoting *Bankers Mortgage Co. v. United States,* 423 F.2d 73, 77 (5th Cir.1970) (emphasis in original)). Consequently, the district judge, who is in the best position to discern and assess all the facts, is vested with a large measure of discretion in deciding whether to grant a Rule 60(b) motion, and the district court's grant or denial of relief under Rule 60(b), unless rooted in an error of law, may be reversed only for abuse of discretion. *See Browder v. Director,* 434 U.S. 257, 263 n. 7, 98 S.Ct. 556, 560 n. 7, 54 L.Ed.2d 521 (1978); *Randall v. Merrill Lynch,* 820 F.2d 1317, 1320 (D.C.Cir.1987); 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2872 (1973). Ap-

plying this standard of review to the case before us, we are nonetheless constrained to reverse the order of the district court, which relied upon both Rule 60(b)(5) and Rule 60(b)(6) to reinstate the Attorney General as a defendant in *Twelve John Does.*

#### A. *Rule 60(b)(5)*

Rule 60(b)(5) provides, in relevant part, that the district court may give relief from a final order if "it is no longer equitable that the judgment should have prospective application." Thus, as the parties in this case acknowledge, an order or judgment may be modified under this portion of Rule 60(b)(5) only to the extent that it has "prospective application."

Virtually every court order causes at least some reverberations into the future, and has, in that literal sense, some prospective effect; even a money judgment has continuing consequences, most obviously until it is satisfied, and thereafter as well inasmuch as everyone is constrained by his or her net worth. That a court's action has continuing consequences, however, does not necessarily mean that it has "prospective application" for the purposes of Rule 60(b)(5). Although neither the rule itself nor the accompanying Notes of the Advisory Committee on Rules attempts to define the term "prospective application," the concept is given content at its core by two venerable Supreme Court decisions, *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), and *State of Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1856), from which the prospective application portion of Rule 60(b) was derived. *See* 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2863 (1973); 7 J. Moore & J. Lucas, *Moore's Federal Practice* 60.26[4] (2d ed. 1982).

In an earlier stage of the *Wheeling* litigation, the Court had held that a bridge spanning the Ohio River was an impermissible obstruction to navigation of the river, which Congress had reserved for the free

---

4. Nor do we address the District's contention that the reinstatement of the Attorney General was authorized under the All Writs Act, 28 U.S.

C. § 1651 (1982), as it was neither urged nor relied upon below.

and unobstructed use of shipping, and ordered that the bridge be either elevated or removed. Shortly thereafter, however, Congress passed a statute declaring the bridge to be lawful. The company that owned the bridge argued that the subsequent congressional action superseded the Court's original judgment, and that the Court's order could therefore no longer be enforced. The State of Pennsylvania argued that an Act of Congress could have no effect on a judgment already rendered by the Court.

In determining whether its original judgment should be modified in light of the statute, the Court distinguished the prospective from the other aspects of its decree. The Court first noted that "if the remedy in this case had been an action at law, and a judgment rendered in favor of the plaintiff for damages, the right to these would have passed beyond the reach of the power of congress." 59 U.S. at 431. Reasoning that the same principle governed its original judgment to the extent that it assessed the costs of the earlier proceeding against the company, the Court held that the company remained liable for them. In contrast to the assessment of costs, the Court found that "part of the decree, directing the abatement of the construction, is executory, a continuing decree, which requires not only the removal of the bridge, but enjoins the defendants against any reconstruction or continuance." *Id.* The Court held that this prospective or "executory" part of its judgment could be modified in light of the new statute altering the legal rights of the parties, and dissolved its original order to the extent that it required the removal or elevation of the bridge.

In *Swift*, the Court was again asked to modify an injunction in light of changed circumstances. Although it declined to do so, the Court, speaking through Justice Cardozo, acknowledged that "[a] continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." 286 U.S. at 114, 52 S.Ct. at 462. Such decrees are "continuing", said Justice Cardozo, only if they "involve the supervision of changing conduct or conditions and are thus provisional and tentative." *Id.*

Thus, the standard we apply in determining whether an order or judgment has prospective application within the meaning of Rule 60(b)(5) is whether it is "executory" or involves "the supervision of changing conduct or conditions," within the meaning of *Wheeling* and *Swift*. Under this standard, we have no difficulty concluding that the order dismissing the Attorney General in *Twelve John Does* did not have the requisite prospective application. The order did not compel him to perform, or order him not to perform, any future act; it did not require the court to supervise any continuing interaction between him and the other parties to the case; rather, it definitively discharged the Attorney General from any further involvement in the case.

Indeed, under the analysis of *Wheeling* and *Swift*, it is difficult to see how an unconditional dismissal could ever have prospective application within the meaning of Rule 60(b)(5). This view of the rule is generally supported by the case law of other circuits. *See Gibbs v. Maxwell House*, 738 F.2d 1153, 1155–56 (11th Cir. 1984) ("That plaintiff remains bound by the dismissal is not a 'prospective effect' within the meaning of rule 60(b)(5) any more than if plaintiff were continuing to feel the effects of a money judgment against him."); *Travelers Indemnity Co. v. Sarkisian*, 794 F.2d 754, 757 n. 4 (2d Cir.1986) (dictum). An intimation to the contrary, however, can be found in *Kirksey v. City of Jackson*, 714 F.2d 42 (5th Cir.1983), upon which the district court relied in this case.

After their previous case had been dismissed on the merits, the appellants in *Kirksey* sought to reopen the case pursuant to Rule 60(b)(5), claiming that intervening changes in statutory and decisional law required a different result. The court held that the dismissal was not an order with prospective application because it would not bar relitigation of the same claims "in light of any significant changes" in the law, *id.* at 44; and consequently, that the case could not be reopened under Rule

60(b)(5). In a dictum, however, the court suggested that under other circumstances, a dismissal could come within the rule:

> If a dismissal would bar a new and independent action between the same parties based on the same claims, reasserted on the basis of the alleged changes in controlling law, and thus denies the plaintiffs the right to retry their claims in light of the changes in the statutory and decisional law applicable to their action, then it would have "prospective application" by virtue of the continuing effect of the bar.

*Id.* at 43.

This dictum not only appears to be at odds with the teaching of *Swift* and *Wheeling,* but also seems unsound for other reasons. Read narrowly, it suggests only that a dismissal has "prospective application" *if* it is accorded res judicata effect *and if* there has been a change in applicable law. Whether an order has prospective application is made to depend, therefore, not only upon the nature and terms of the order itself, but also upon whether there has been a change in the law. The change in law seems logically to be relevant, however, only after the court has determined that the order has prospective application under Rule 60(b)(5); it may then be altered if it is no longer equitable as originally framed, because of a change in applicable law or otherwise. Read broadly, as urged by appellees, the dictum suggests that *any* order that precludes relitigation of a claim has "prospective application" for that reason alone. Under this reading, any final order or judgment on the merits could potentially be reopened under Rule 60(b), which is plainly inconsistent with the requirement of prospective application as it has been applied thus far. Indeed, this view of Rule 60(b) is inconsistent with the approach in *Swift* and *Wheeling.* Hence, we decline to adopt the reasoning of the *Kirksey* dictum as our own.

Inasmuch as the dismissal of the Attorney General was not an order with prospective application, the district court's reliance on Rule 60(b)(5) to reinstate him as a defendant was erroneous as a matter of law.

## B.   *Rule 60(b)(6)*

■   While subsections (1)–(5) of Rule 60(b) identify specific situations in which the court may modify final orders and judgments, the final subsection of the rule, Rule 60(b)(6), is a catch-all, residual clause. It provides that the court may alter a final order, "upon such terms as are just," for "any other reason justifying relief from the operation of the judgment." Although the language of this residual clause is essentially boundless—giving it the potential to envelop completely the principle of finality—the Supreme Court has held that it applies only to "extraordinary" situations, *Ackermann v. United States,* 340 U.S. 193, 202, 71 S.Ct. 209, 213, 95 L.Ed.2d 207 (1950); and this court has cautioned that it "should be only sparingly used." *Good Luck Nursing Home, Inc. v. Harris,* 636 F.2d 572, 577 (D.C.Cir.1980). It is clear, for example, that a more compelling showing of inequity or hardship is necessary to warrant relief under subsection (6) than under subsection (5); otherwise, the ready availability of subsection (6) would make meaningless the limitation of subsection (5) to judgments with prospective application.

Two Supreme Court cases roughly demarcate the bounds within which district courts may exercise their discretion to grant or deny motions under Rule 60(b)(6). In *Klapprott v. United States,* 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266, 1099 (1949), the Court held that a default judgment stripping the petitioner of citizenship was properly vacated under the rule when, at the time of the judgment, the petitioner was serving a prison term, was facing health and financial hardships, and was not represented by counsel. In *Ackermann,* a superficially similar denaturalization case, the Court held that relief under Rule 60(b)(6) was not warranted, essentially because the petitioner had been represented by counsel at the denaturalization proceeding, but had chosen not to appeal the decision depriving him of citizenship. Four years after his denaturalization proceeding, an appellate court reversed a similar judgment against his brother-in-law "on the Government's admission that the evidence"

—which was "substantially the same" as that against the petitioner—"was insufficient to support it." 340 U.S. at 204, 71 S.Ct. at 214 (Black, J., dissenting). In light of this development, the petitioner asked to have his judgment vacated, arguing that he was in prison at the time he could have appealed, was financially unable to pursue an appeal, and had been advised by an official of the U.S. Naturalization Department that an immediate appeal was unnecessary. The Court, however, rejected petitioner's contention that he was unable to appeal, and found instead that "[p]etitioner made a considered choice not to appeal, apparently because he did not feel that an appeal would prove to be worth" the financial sacrifice it would require. *Id.* at 198, 71 S.Ct. at 198. In refusing relief, the Court stressed that Rule 60(b)(6) could not be used to relieve a party of the consequences of his voluntary choice not to pursue an appeal. *Id.* at 200, 71 S.Ct. at 212.

Indeed, it is a commonplace that Rule 60(b)(6) may not be used as a substitute for an appeal not taken. *See, e.g., DeFilippis v. United States,* 567 F.2d 341, 343 n. 5 (7th Cir.1977); *Martinez–McBean v. Government of the Virgin Islands,* 562 F.2d 908, 911 (3rd Cir.1977); *Lubben v. Selective Service,* 453 F.2d 645, 651–52 (1st Cir.1972). Therefore, a party who has not pursued an appeal may obtain relief under Rule 60(b)(6) only if there are "circumstances ... so extraordinary as to bring him within *Klapprott* or Rule 60(b)(6)," *Ackerman,* 340 U.S. at 202, 71 S.Ct. at 213, i.e., circumstances that essentially made the decision not to appeal an involuntary one. *See Martella v. Marine Cooks & Stewards Union,* 448 F.2d 729 (9th Cir. 1971); *see also Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institute,* 500 F.2d 808 (D.C.Cir.1974) (relief under Rule 60(b)(6) granted where failure to appeal attributable to clerk's failure to notify either party that summary judgment had been entered, prevailing party not prejudiced by the appeal, and motion to vacate filed promptly after learning of summary judgment).

In this case, as we noted above, there is no indication in the record that appellees attempted to appeal the dismissal pursuant to the certification procedure of Fed.R.Civ. P. 54(b), which would have allowed them immediately to challenge the dismissal in this court. Nor did they reserve the right to appeal the Attorney General's dismissal when they entered into the consent decree. Instead, it appears that appellees made a strategic choice not to appeal the dismissal of the Attorney General, choosing instead to pursue their claim solely against the District and its officials. The Supreme Court's decision in *Ackermann* makes it clear that where the parties seeking relief have made a "free, calculated, deliberate" decision not to appeal, Rule 60(b)(6) is simply not available to relieve them of the consequences of that decision, absent extraordinary circumstances not found here.

■ We are troubled, moreover, by the rationale the district court relied upon to invoke Rule 60(b) in this case. As a basis for reinstating the Attorney General as a defendant, the district court referred to changed circumstances at the prison:

> The circumstances under which the Court entered its December 5, 1980, order have changed markedly. At the inception of this case in 1980, population issues were peripheral to the central issues of safety and security raised in the complaint. Today, the chronic overcrowding plaguing all of the Lorton facilities has rendered all other issues academic.

We concede that the district court, having grappled steadfastly with this litigation for a number of years, is in a better position than this court to determine the degree to which circumstances have changed over its long course. After carefully reviewing the record, however, we cannot agree that the current population crisis presents the type of extraordinary change in circumstance that would warrant relief under Rule 60(b). Both the complaint and the consent decree in *Twelve John Does* seem to belie the notion that overcrowding has only recently become a central issue in the case. Overcrowding and its attendant problems are mentioned prominently and repeatedly in

the complaint;[5] and as we noted above, the consent decree specifically states that "[i]t is understood by the parties that the elements of this Agreement rest fundamentally on the number of residents committed to the Central Facility"—a statement that would be rather curious if overcrowding were not a primary concern.

Until this most recent stage of the litigation, moreover, appellees apparently viewed overcrowding as having been a central issue in their suit from the beginning rather than a recent change in circumstances. Indeed, less than two years before entry of the order now before us, when the District sought to modify the consent decree under Rule 60(b)(5) in order to raise the population limit at Central, appellees scoffed at the suggestion that overcrowding at D.C. prisons was unexpected and unforeseen:

> Although the District points to the increase in the population at the Jail as the "changed circumstance" justifying modification, it is clear that overcrowding at the Jail is neither unexpected nor unforeseen.
>
> . . . .
>
> ... Thus, contrary to the District's representation, the District's facilities

were overcrowded at the time of the Decree and have remained so since.

Plaintiffs' Opposition to Defendants' Motion Under Fed.R.Civ.P. 60(b) to Modify the Consent Decree, at pp. 14–15 (Aug. 21, 1985). While overcrowding may indeed be more severe than in the past, in light of this evidence we are hard pressed to find in the record the extraordinary change in circumstances that might justify the grant of relief under Rule 60(b)(6).[6]

## IV. CONCLUSION

The district court relied on Rules 60(b)(5) and 60(b)(6) to reinstate the Attorney General as a defendant in *Twelve John Does* almost seven years after dismissing him from the case. Because the dismissal did not have "prospective application" for the purposes of Rule 60(b)(5), we hold that the court's reliance on that rule was misplaced as a matter of law. In light of the appellees' failure to appeal the dismissal, and the absence of any extraordinary change in the circumstances of this litigation, we further hold that the district court abused its discretion under Rule 60(b)(6).[7] Accordingly, the district court's order reinstating the Attorney General as a defendant is re-

---

5. In its brief in support of the reinstatement of the Attorney General, the District claims that the complaint mentions overcrowding only "four times, in passing," and cites to four paragraphs in the complaint. We count in the complaint more than twice that many references to overcrowding. One such reference that was not cited by the District is directly beneath the heading *Archaic and Overcrowded Living Facilities.* It states:

> The herding of a large number of inmates into overcrowded single-room and outmoded dormitories creates substantially increased tensions and resulting violence. The packing together of beds, lockers, and personal belongings makes the addition of a new resident in a dormitory under the "find a spot" classification system [under which new inmates are not assigned to a specific area but are simply told to find a spot wherever they can] a cause of melees and violence. New residents have been beaten and their beds and possessions hurled out of the dormitory when they attempted to find places on their own.

While we assume that the District's omissions were simply an oversight, it is the kind of oversight that compels us to look carefully at a party's other submissions.

6. The parties disagree over whether the reinstatement of the Attorney General would effectively bind him to the consent decree, to which he never consented, and in the framing of which he had no hand. In light of our disposition of the case, we need not address this issue, nor decide whether reinstatement pursuant to Rule 60(b) may ever have such an effect.

7. If the appellees commence a new action against the Attorney General, the district court will have to decide whether the 1980 order dismissing the Attorney General should be accorded preclusive effect. On this record, it is unclear whether the district court, when it reinstated the Attorney General and enjoined him from assigning additional prisoners to D.C. prisons, considered fully the views of the plaintiffs in the *Inmates of Occoquan* case, who strongly opposed such an order for fear that it would take many inmates far from their families. We therefore note only that if a new action against the Attorney General is filed, all of the prisoners affected (or their class representatives) should be joined as parties necessary for a just adjudication of the suit.

versed, and the preliminary injunction barring him from designating District of Columbia prisons as the place of confinement for prisoners convicted and sentenced in D.C. Superior Court is vacated.

*So ordered.*