CINCINNATI INSURANCE CO., Plaintiff–Appellee,

v.

FLANDERS ELECTRIC MOTOR SERVICE, INC., Defendant–Appellant.

No. 96–2778.

United States Court of Appeals, Seventh Circuit.

Argued March 26, 1997.

Decided Dec. 4, 1997.

Karl L. Mulvaney (argued), Martha S. Hollingsworth, Julia Elizabeth Dimick, Bingham, Summers, Welsh & Spilman, Indianapolis, IN, for Plaintiff–Appellee.

Bruce D. Ryder (argued), Joseph G. Nassif, Linda W. Tape, St. Louis, MO, for Defendant–Appellant.

Before PELL, KANNE and DIANE P. WOOD, Circuit Judges.

KANNE, Circuit Judge.

Flanders Motor Service, Inc. sells and repairs motors and other equipment at its facility in Evansville, Indiana. During a seventeen year period from 1971 to 1988, Flanders sent several electrical transformers in need of repair to the Missouri Electric Works ("MEW") in Cape Girardeau, Missouri. On at least two occasions those transformers may have contained fluids contaminated with PCBs. Sometime in the mid 1980's an investigation revealed substantial PCB contamination of the soil at the MEW site. The Environmental Protection Agency ("EPA") concluded that leaks from oil drums and transformers over a twenty year period were the source of the contamination. As a result, the EPA notified Flanders and some 600 other businesses that they were potentially responsible for investigation and remediation costs incurred at the MEW site pursuant to the

Comprehensive Environmental Response, Compensation, and Liability Act of 1980.

Flanders had one general liability insurance policy and two umbrella policies with Cincinnati Insurance Company ("Cincinnati") covering property damage claims for specified periods. In September of 1989, Flanders notified Cincinnati of Flanders' status as a potentially responsible party for environmental contamination at the MEW site. Flanders asserted that under the three policies issued by Cincinnati, Cincinnati was obligated to defend and indemnify Flanders against any property damage claim arising from the pollution at the MEW site. Each of the three insurance policies at issue contained an identical pollution exclusion clause. Under the terms of the pollution exclusion clause, the policies did not provide coverage for property damage arising from pollution unless the release of pollutants could be characterized as "sudden or accidental."

Cincinnati denied coverage to Flanders on the insurance policies and filed a declaratory judgment action in federal district court on November 14, 1991, asking the court to support its decision to deny Flanders coverage. On August 7, 1992, Cincinnati filed a motion for summary judgment arguing that Flanders' insurance policies provided no coverage for claims arising from the MEW site due to the pollution exclusion "sudden and accidental" clause. On October 20, 1993, the district court granted Cincinnati's summary judgment motion, holding that the phrase "sudden and accidental" in the pollution exclusion clause was clear and unambiguous and precluded coverage for the type of gradual property damage alleged. Flanders filed a motion to reconsider the court's declaratory judgment and that motion was denied.

Flanders appealed the district court's decision to this Court[1] and oral argument was held on April 12, 1994. On September 2, 1994, while the Flanders' case was under advisement, the Supreme Court of Indiana agreed to hear a direct appeal of a case involving issues quite similar to those presented to us. Specifically, the Indiana Supreme Court was asked in *American States Ins. Co. v. Kiger,* 662 N.E.2d 945 (Ind.1996), to determine whether under Indiana law an insurance policy's "sudden and accidental" pollution exclusion clause was ambiguous and should be interpreted to mean "unexpected" and "unintended."

Shortly after the Indiana Supreme Court agreed to hear the *Kiger* case, Flanders filed with us a Motion for Stay of Proceedings based on the pendency of the *Kiger* decision. We denied Flanders' motion and ten days later, on November 7, 1994, we affirmed the district court's declaratory judgment. *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,* 40 F.3d 146 (7th Cir.1994) ("*Cincinnati I*"). Noting that this case "presents a question of Indiana law that to date has not been addressed by the Indiana Supreme Court," *id.* at 150, we held that "if the Indiana Supreme Court were presented with this question, it would conclude that the term 'sudden,' as it is used [in the policies] is unambiguous" and the language of the policies would exclude the type of pollution for which Flanders sought coverage. *Id.* at 154.

On March 27, 1996, over a year and a half after our decision in *Cincinnati I,* the Indiana Supreme Court issued its *Kiger* opinion. In doing so, Indiana's highest court determined that the words "sudden and accidental" in the pollution exclusion clause were ambiguous as a matter of law and should be interpreted to mean "unexpected" and "unintended." *Kiger,* 662 N.E.2d at 947–48.

As a result of the Indiana Supreme Court's decision, Flanders filed a Motion for Relief from Final Judgment in the district court on May 1, 1996, pursuant to Federal Rules of Civil Procedure 60(b)(5) and 60(b)(6). Shortly after the motion was filed, the Indiana Supreme Court decided another insurance case, *Seymour Mfg. Co. v. Commercial Union Ins.,* 665 N.E.2d 891 (Ind.1996), reaffirming the Kiger opinion's interpretation of the phrase "sudden and accidental" in the pollution exclusion clause.

---

1. Flanders did not request certification of the case to the Indiana Supreme Court. *See* 7th Cir. R. 52. If Flanders had done so, the equities may have appeared in a different light to this Court, but the difference between a request for certification and the stay Flanders actually requested is fairly minor.

On June 19, 1996, the district court denied Flanders' Motion for Relief from Final Judgment. Flanders appeals the district court's decision denying relief under Rule 60(b).

## ANALYSIS

### A. *Standard of Review*

 We review the denial of a Rule 60(b) motion for an abuse of discretion, but in so doing we may not reach the merits of the underlying judgment. *See Soler v. Waite*, 989 F.2d 251, 253 (7th Cir.1993). The "abuse of discretion" standard

> simply means that we shall not second-guess the decision of a trial judge that is in conformity with established legal principles and, in terms of its application of those principles to the facts of the case, is within the range of options from which one could expect a reasonable trial judge to select.

*Id.* (quoting *United States v. Koen*, 982 F.2d 1101, 1114 (7th Cir.1992)). A decision constitutes an abuse of discretion when it is "not just clearly incorrect, but downright unreasonable." *Morton v. Smith*, 91 F.3d 867, 870 (7th Cir.1996) (quoting *Fuller v. CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir.1990)). Rule 60(b) relief is an extraordinary remedy and is granted only in exceptional circumstances. *See Dickerson v. Board of Educ. of Ford Heights, Ill.*, 32 F.3d 1114, 1116 (7th Cir. 1994). The appellant bears the burden of proving the abuse of discretion. *See Soler*, 989 F.2d at 253.

### B. *Motion for Relief Pursuant to Rules 60(b)(5) and 60(b)(6)* [2]

Rule 60(b) specifically authorizes district courts to relieve a party from a final judgment under a variety of circumstances. Nevertheless, the need for the finality of judgments is an overarching concern. Rule 60(b) sets a "higher value on the social interest in the finality of litigation." *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 682 (7th Cir.1983). We devote our attention here to subsections (5) and (6) of Rule 60(b), with particular focus on their application in diversity cases involving changes in state decisional law. Diversity cases under *Erie* [3] present a particular concern for finality. What federal courts in diversity cases attempt to do, where statutory interpretation remains open, is to make a studied effort to determine how a state's highest court would interpret the law in question. Of course, as in any human endeavor, such predictions are not always accurate, but that does not mean that the decision of the federal court—where the prediction is rendered incorrect by a subsequent state supreme court decision—warrants being set aside under Rule 60(b).

 Generally, a change in state decisional law is insufficient to constitute an extraordinary circumstance warranting relief under Rule 60(b). As the Supreme Court recently stated, "[i]ntervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6)." *Agostini v. Felton*, — U.S. ——, ——, 117 S.Ct. 1997, 2018, 138 L.Ed.2d 391 (1997). This proposition is also set forth in *DeWeerth v. Baldinger*, 38 F.3d 1266, 1272–73 (2d Cir.1994) where the court observed that "the fact that federal courts must follow state law when deciding a diversity case does not mean that a subsequent change in the law of the state will provide grounds for relief under Rule 60(b)(6)." As the Second Circuit stated, "*Erie* simply does not stand for the proposition that a plaintiff is entitled to reopen a federal court case that has been closed for several years in order to gain the benefit of a newly-announced decision of a state court." *Id.* at 1272. In Dowell v. State Farm *Fire & Cas. Auto. Ins.*

2. Rules 60(b)(5) and 60(b)(6) state, in pertinent part:
> On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons:
> ....
> (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

3. Federal courts are required under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) to apply and interpret state law on substantive matters that neither are constitutional in nature nor involve federal laws.

*Co.,* 993 F.2d 46, 48 (4th Cir.1993), the Fourth Circuit likewise held that a mere "decisional change in the law subsequent to the issuance of a final judgment ... does not provide a sufficient basis for vacating the judgment under Rule 60(b)(5)."

■ We believe that the decision of this Court in *Cincinnati I* was a valid and well-reasoned effort to carry out our duty under *Erie.* Moreover, the fact that our prediction—and the prediction of the district court—was contrary to the conclusion later reached by the Indiana Supreme Court does not constitute an extraordinary circumstance warranting the reopening of this case to achieve a similar result. *See DeWeerth,* 38 F.3d at 1274. "There is nothing in *Erie* that suggests that consistency must be achieved at the expense of finality, or that federal cases finally disposed of must be revisited anytime an unrelated state case clarifies the applicable rules of law." *Id.* We agree with the Second Circuit that the use of Rule 60(b)(6) to obtain such relief in diversity cases "is simply an improvident course that would encourage countless attacks on federal judgments long since closed." *Id.* As the court in *DeWeerth* observed:

> [t]he very nature of diversity jurisdiction leaves open the possibility that a state court will subsequently disagree with a federal court's interpretation of state law. However, this aspect of our dual justice system does not mean that all diversity judgments are subject to revision once a state court later addresses the litigated issues. Such a rule would be tantamount to holding that the doctrine of finality does not apply to diversity judgments, a theory that has no basis in *Erie* or its progeny.

*Id.* at 1273–74. In *McGeshick v. Choucair,* 72 F.3d 62 (7th Cir.1995), we commented on the Second Circuit's holding in *DeWeerth* and in doing so we stated that

> cases such as this one do not pose a direct clash between the need for finality in litigation and the policies embodied in the *Erie* doctrine. *Erie* requires that, at the time of decision, the federal court apply the law of the state in which it sits. *It does not require that later changes in*

> *that state law be treated as a ground for reopening that judgment.*

*McGeshick,* 72 F.3d at 64–65 (emphasis added) (citation omitted).

■ Flanders filed its motion for relief based on the Indiana Supreme Court's (*Kiger* and *Seymour*) interpretation of the pollution exclusion clause that, in effect, overruled the prior interpretation of Indiana insurance law given by the district court and this Court (*Cincinnati I*). Flanders concedes that the mere change in state decisional law is not by itself an "exceptional circumstance" that would be adequate grounds for relief under Rule 60(b). But Flanders argues that some other MEW site "potentially responsible parties" are "obtaining insurance coverage for the EPA MEW cleanup because of the *Kiger* and *Seymour* cases." Appellant's Br. at 21. It is also argued by Flanders that it is being sued by an adjacent landowner of the MEW site for alleged contamination and that, in that case, Cincinnati is required to provide a defense because of *Kiger* and *Seymour. Id.*

Thus, two inequities are claimed as a result of the declared absence of Flanders' insurance coverage by Cincinnati for the MEW site. Flanders argues that it is being inequitably treated vis-a-vis some other "potentially responsible parties" and also with regard to its lack of coverage relating to the MEW site contrasted to coverage relating to the suit by the landowner adjacent thereto. Flanders concludes that "[t]his inequitable result only came about because Cincinnati was lucky enough to get an early ruling in this case." *Id.*

It appears that Flanders contends that it was prejudiced because this Court produced an "early ruling" in *Cincinnati I*—a year and a half prior to the Indiana Supreme Court's decision in *Kiger.* In fact, the appeal in *Cincinnati I* was docketed in this Court on November 1, 1993. Oral argument was heard over five months later on April 12, 1994. The opinion in *Cincinnati I* was issued on November 7, 1994. The mandate was issued on December 28, 1994. The time from filing of the appeal until the issuance of the mandate was over 13 months. In the Seventh Circuit in 1994 the median time from filing a notice of appeal to final disposi-

tion was 11.5 months. Adm. Office of the U.S. Courts, *1994 Federal Court Management Statistics*, p. 17. Thus, *Cincinnati I* could hardly be characterized as a case which received an "early ruling."

Flanders also complains that this Court declined to enter a stay once the Supreme Court of Indiana had agreed to hear a direct appeal in *Kiger*. However, Flanders' motion to "abate the case" was filed on October 3, 1994, nearly six months after oral argument and a little over one month prior to the issuance of the opinion in *Cincinnati I*. The last minute request to abate or stay the proceedings in *Cincinnati I* does not push the equities heavily in Flanders direction.

While there is no doubt that Flanders will be somewhat disadvantaged financially by bearing the cost of defense in the MEW site case (the extent to which Flanders is disadvantaged is, however, unclear from the record), it has not made a compelling showing of such hardship and unfairness sufficient to demonstrate that the district court abused its discretion in denying it relief under Rule 60(b)(6).

As we noted earlier, a decision constitutes an abuse of discretion when it is "not just clearly incorrect but downright unreasonable." *Morton*, 91 F.3d at 870 (quoting *Fuller v. CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir.1990)). Any change in the law may leave one or more parties of earlier litigation with the feeling that they have been treated unfairly, but this must be balanced with the need for finality of litigation. Absent extraordinary circumstances creating a substantial danger that the underlying judgment was unjust, it is certainly a proper use of a district court's discretion to invoke the strong policy favoring the finality of judgments. *See Lee v. Village of River Forest*, 936 F.2d 976, 978 (7th Cir.1991).

■ Turning now to relief under Rule 60(b)(5), this rule contains specific requirements that the judgment be "no longer equitable" and "prospective" in application. *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138 (D.C.Cir.1988). We look initially to the issue of prospective application of the judgment. Judgments are prospective when they are "executory" or "in-

volve the supervision of changing conduct or conditions." *Id.* at 1139. In determining whether the judgment order was prospective, the court in *Twelve John Does* stated

> Virtually every court order causes at least some reverberations into the future, and has, in that literal sense, some prospective effect; even a money judgment has continuing consequences, most obviously until it is satisfied, and thereafter as well inasmuch as everyone is constrained by his or her net worth. That a court's action has continuing consequences, however, does not necessarily mean that it has "prospective application" for the purposes of Rule 60(b)(5).
>
> . . . .
>
> Under this standard, we have no difficulty concluding that the order dismissing the Attorney General ... did not have the requisite prospective application. The order did not compel him to perform, or order him not to perform, any future act; it did not require the court to supervise any continuing interaction between him and the other parties to the case; rather, it definitively discharged the Attorney General from any further involvement in the case.

*Id.* at 1138–39.

This standard articulated in *Twelve John Does* has been applied by other courts in the Rule 60(b)(5) context. For example, in refusing to allow the declaratory judgment to be set aside under Rule 60(b)(5), the court in *DeWeerth* held that the judgment from which relief was sought was not prospective. The court reasoned:

> The nature of the judgment sought in this case was a declaration of rights regarding title to personal property. The fact that physical transfer of the [painting] would have been required to comport with the judgment if DeWeerth had prevailed does not render the judgment "executory." A similar transfer of assets is also required where the court enters a money judgment. Even if the district court in this case were involved in enforcing an ordered transfer, its involvement would not constitute "su-

pervision of changing conduct or conditions." .

DeWeerth's argument that declaratory judgments may have prospective application is also unpersuasive. The types of declaratory judgments referred to by DeWeerth, orders of disbarment and judgments which form a lien on property, affect events that happen in the future, and thus are distinguishable from the final judgment in this case, which simply resolved the parties' rights based on a past dispute. *DeWeerth*, 38 F.3d at 1276. Generally, relief from the prospective application of judgments under Rule 60(b)(5) has been granted almost exclusively in cases dealing with injunctions and consent decrees. Nevertheless, "[r]elief seems to be possible under this portion of the rule from the prospective operation of a declaratory judgment." 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2863, n. 13 (2d ed.1995).

Flanders argues that the "[d]istrict [c]ourt's finding that Cincinnati has no obligation under the Flanders insurance policies in effect acts as a continuing injunction that compels Flanders to perform certain acts, *i.e.* defend itself, that it would not have to but for this judgment." Appellant's Br. at 17. However, as noted in Twelve John Does, many judgments have continuing consequences in the future but that does not mean they have "prospective application" for the purposes of Rule 60(b)(5). *See Twelve John Does*, 841 F.2d at 1138. In fact, the district court found that to be the situation in this case. But, the declaratory judgment that is the subject of this litigation is neither "executory" nor "involves the supervision of changing conduct or conditions." *Id.* at 1139. The scope of the declaratory judgment specifically addressed the rights, duties, and obligations of the parties under Indiana insurance contract law as it existed at the time the policies were issued. Coverage was not afforded to Flanders from the very beginning.

Like the declaratory judgment in *DeWeerth*, the district court's judgment in this case was a declaration of rights and duties of the parties based on the established, unchanging facts of PCB contamination at the MEW site between 1971 and 1988. The judgment was not directed at some future event. Rather, the judgment declared duties and obligations existing at the formation of the insurance contracts. The contractual interpretation was not a judgment compelling either party to perform a future act or ordering either party not to perform a future act. The judgment did not require the district court to supervise continuing interaction between Cincinnati and Flanders. Likewise, the judgment does not apply to contamination that may have occurred at locations other than the MEW site or at the MEW site after 1988.

Finally, although we need not reach this issue because we have found the declaratory judgment has no prospective application, we touch briefly on the other requirement of Rule 60(b)(5), that the result of the judgment in question is "no longer equitable." As we noted above, under Rule 60(b)(6), the district court did not abuse its discretion in determining that the inequities visited upon Flanders by *Cincinnati I* were insufficient to afford relief under that section. It is true "that a more compelling showing of inequity or hardship is necessary to warrant relief under Rule 60(b)(6) than under Rule 60(b)(5)." *Twelve John Does*, 841 F.2d at 1140. Nevertheless, even with a less demanding standard under Rule 60(b)(5), the proposition that *Cincinnati I* is "no longer equitable" cannot prevail in light of the unextraordinary nature of any resulting inequities and the strong policy favoring finality of decisions.

Flanders has been unable to carry its substantial burden to show an abuse of discretion with regard to the district court's denial of Rule 60(b) relief. The district court did not abuse its considerable discretion in determining that the change in state decisional law resulting from the Indiana Supreme Court cases of *Kiger* and *Seymour* created no extraordinary circumstances; nor did the district court abuse its discretion in finding that the declaratory judgment issued in this case was not prospective in application as viewed under Rule 60(b)(5). We therefore AFFIRM the district court's denial of relief under both Rule 60(b)(5) and Rule 60(b)(6).