**James FULLER, Plaintiff–Appellant,**

**v.**

**CBT CORPORATION, American Selfcare Corporation, Chicago Board of Trade, and Chicago Board of Trade Health Plan, Defendants–Appellees.**

No. 89–2977.

United States Court of Appeals,
Seventh Circuit.

Argued April 13, 1990.

Decided June 21, 1990.

Mildred F. Haggerty, Haggerty, Koening & Hill, Chicago, Ill., for plaintiff-appellant.

Robert J. Bates, Jr., Therese A. Kelly, Phelan, Pope & John, Scott E. Early, Terrance K. Livingston, Randall E. Server, Martin, Cohn & Associates, Chicago, Ill., for defendants-appellees.

Before CUDAHY, POSNER, and FLAUM, Circuit Judges.

POSNER, Circuit Judge.

This is an appeal from the dismissal, on motion for summary judgment, of a suit that charges two separate violations of an employee health plan. (The basis of federal jurisdiction is ERISA, the federal pension and welfare plan statute. Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.*) The plaintiff, James Fuller, was employed as an auditor by the Board of Trade, and the first violation charged arises out of an operation that he had in March of 1986 to remove a sperm granuloma (a type of growth) that had developed at the site of a vasectomy. In the same operation he had the vasectomy reversed so that he and his wife could have additional children. The bill exceeded $7,500 but the plan was unwilling to reimburse him more than $300, the plan's estimate of the cost allocable to the removal of the granuloma. Fuller contends that this allocation is too low, and in addition that he is entitled to the cost of his overnight stay at the hospital, which was necessitated by his reaction to the anesthesia. But in this court he has abandoned his argument that the plan covers vasectomy reversals; and while arguing that employees of the plan told him that it did cover that procedure he does not argue that their statements bind the plan, for example on a theory of estoppel. *Black v. TIC Investment Corp.*, 900 F.2d 112 (7th Cir.1990).

The plan confines coverage of medical expenses to "conditions," defined as "illness" or "pregnancy," the former being "an injury or sickness." "Injury" means "accidental bodily injury," and "sickness" "any physical or mental disease or any emotional or nervous disorder, [including] alcoholism, drug addiction, and pregnancy." The reversal of a vasectomy is not the treatment of a disease or disorder in any obvious sense, but that is not critical. We are not devotees of literal interpretation. Sterility is a condition for which medical treatment is commonly sought, and, as in *Egert v. Connecticut General Life Ins. Co.*, 900 F.2d 1032 (7th Cir.1990), we find it difficult to believe that the plan excludes all fertility treatment. Now a vasectomy produces sterility; but it is self-induced sterility, and that makes all the difference. The plan, no doubt reflecting concern with the "moral hazard" (the temptation to alter one's behavior because one is insured) that is created when a person buys insurance against the consequences of his *deliberate* behavior, *Connecticut General Life Ins. Co. v. Shelton*, 611 S.W.2d 928, 930–32 (Tex.Civ.App.1981), excludes from coverage treatment of "any condition resulting from an intentional self-inflicted injury." If sterility could fairly be called an "injury," the reversal of a vasectomy would be treatment of a condition resulting from an intentional self-inflicted injury. While we grant that the consequence of a vasectomy is better described as a condition than as an injury, the exclusionary intention of the provision we have quoted seems both clear and clearly applicable to vasectomy reversals.

The plan muddies these waters a bit, though, by grounding its denial of liability not on the definition of sickness but on a provision in the plan that "medical services or supplies not certified as necessary by a physician" are not covered. The purpose of this exclusion is not to confine coverage to conditions that a physician might think "necessary" to treat, but to avoid coverage of extravagant procedures. Few conditions are *necessary* to treat in the sense that if they are left untreated the patient will die, be crippled, or suffer excruciating pain. A patient might have a disfiguring scar; in what sense would its removal be "necessary"? A physician might think it unnecessary to treat a fertility problem, because people can live in perfect physical health and adequate mental health without being fertile; we do not think that on this account no fertility treatments are covered by the plan. The plan covers cosmetic surgery, provided that it is required to correct a disfigurement due to a nonoccupational accident; the line drawn is (approximately) between the frivolous and the sober resort to discretionary medical treatment, and the treatment of fertility is surely on the sober side of the line.

■ The significance of the "certified as necessary" provision in this case lies not in determining whether vasectomy reversals are covered, but in making clear that, since they are not, the presence of the granuloma (a covered condition) does not bring Fuller's vasectomy reversal within the scope of coverage. One does not require a vasectomy reversal in order to remove a granuloma that has developed at the site of the vasectomy.

Fuller is left to argue over the cost allocable to the removal of the granuloma, an admittedly covered expense. He failed to submit evidence on what the removal of a granuloma should cost. As for the overnight stay in the hospital, it plainly was not caused by the simple out-patient procedure of removing a granuloma; it was caused by the operation to reverse the vasectomy. Now even if vasectomy reversal is not a covered procedure, an illness incident to the procedure—infection, complications, a iatrogenic injury, whatever—would be covered. Playing tennis is not a covered procedure either, but if you are injured playing tennis your medical expenses are covered. The record contains a letter from Fuller's physician suggesting (in the fractured prose that is the hallmark of physicians' epistolary endeavors) that the overnight stay was necessary because of complications resulting from the operation to reverse the vasectomy and remove the granuloma, as distinct from being a necessary incident of a normal vasectomy reversal.

But Fuller does not argue the point in this court, and it is therefore forfeited.

To defeat the plan's motion for summary judgment on this point, all Fuller had to do was to submit an affidavit from a reputable surgeon concerning the cost of removing a sperm granuloma. But that much he had to do; he could not rest on his pleadings when the plan had submitted evidence on the cost allocable to the removal of the granuloma. Fed.R.Civ.P. 56(e). Fuller submitted no affidavit or equivalent evidentiary material. He did submit his medical bills; but without comment or interpretation (not offered), they do not disclose principles of cost accounting from which the district judge could have concluded that $300 of the total cost of Fuller's medical and hospital treatment was too little to allocate to the removal of the granuloma. (An additional problem is Fuller's failure to make the bills a part of the appellate record.) We therefore need not consider the subtle issue of cost allocation that would be presented if the cost of removing the granuloma were low by virtue of the fact that the procedure was done in conjunction with reversing the vasectomy. The issue would then be whether Fuller or the plan was entitled to the benefits of this economy of scope. The issue is not before us, because Fuller failed to present intelligible evidence of the relevant costs.

We move on to the second alleged breach of the welfare plan. Fuller quit his job with the Board of Trade on Friday, July 18, 1986, and since he was starting a new job with another employer on Monday he elected not to convert his medical coverage under the Board's plan to an individual policy. By very bad luck, Fuller and his wife and two sons were in an automobile accident with an uninsured motorist on Sunday, July 20, the day before his new job began, and the two boys were seriously injured; at least one, and possibly both, were in comas. The Board of Trade permitted Fuller to revoke his earlier decision not to convert, and he bought a medical insurance policy that covered pre-existing conditions but was less generous than the Board's plan. The boys retained their dependent coverage under the Board's plan until the end of July, because Fuller had paid the dependents' premium under the plan through the end of the month. The boys' medical costs exceeded $62,000, of which the Board's plan paid almost $25,000 and Fuller's new plan paid some of the rest, leaving however a considerable deficit that Fuller claims the Board's plan should have paid.

■■■ The issue is one of contractual interpretation. Unless an ERISA plan empowers the plan's trustees to construe doubtful or contested terms, the court is to interpret the plan independently and thus give no deference to the trustees' interpretation. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). The Board's plan, however, empowers the trustees "to construe and interpret the plan." Answering a question left open in *Sisters of the Third Order of St. Francis v. SwedishAmerican Group*, 901 F.2d 1369, 1371, (7th Cir.1990), we hold that this language brings a plan within *Firestone*'s exception for plans whose trustees are empowered to construe doubtful or contested terms—what else could the language we have quoted mean? And the grant of power is not taken back by the further provision of the plan that the trustees "shall have no power to add to, subtract from or modify any of the terms of the plan." Interpretation and modification are different, and the power to do the first is not qualified by denial of the power to do the second. Otherwise courts—which except in extraordinary circumstances are not empowered to *modify* contracts (the exceptions include the cy-pres doctrine and the equitable power of reformation)— would lack the power to *interpret* them. Since in this case the trustees did have discretion to interpret the plan, we can overturn their determination only by finding that they abused their discretion— which is to say, that they were not just clearly incorrect but downright unreasonable. *Disher v. Information Resources, Inc.*, 873 F.2d 136, 140 (7th Cir.1989). And analysis is not complicated here by any contention that the plan's trustees had a conflict of interest. *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d

1556, 1566–67 (11th Cir.1990). Fuller makes no such contention.

■ The plan covers medical expenses "to the extent that they are incurred by a covered person as a result of a condition." Fuller's boys ceased to be covered persons at the end of July, and the plan argues that any expenses incurred thereafter were not incurred by covered persons. But a number of cases interpreting the word "incurred" in medical and hospital insurance policies allow the insured to recover all expenses necessitated by events occurring within the period of coverage, rather than merely those expenses actually paid, or payable, or contractually obligated, during that period. *Tusa v. Prudential Ins. Co.,* 825 F.2d 69, 73 n. 3 (5th Cir.1987); *Fishman v. Howard,* 447 So.2d 513, 519–20 (La.App.1984); *Whittle v. Government Employees Ins. Co.,* 51 Misc.2d 498, 273 N.Y.S.2d 442 (App.Term.1966) (per curiam); *Maryland Casualty Co. v. Thomas,* 289 S.W.2d 652, 655 (Tex.Civ.App.1956). These cases do some, but perhaps not undue, violence to the semantics of "incurred"; and while the somewhat strained interpretation they adopt may bespeak a certain hostility to insurance companies, a contrary interpretation might distort incentives: might lead to prepayment of medical expenses, or to other methods of accelerating the incurring of medical expenses that would otherwise fall due after coverage had ended—or even, as remarked in *Humphries v. Puritan Life Ins. Co.,* 311 So.2d 534, 538 (La. App.1975), to the undertaking of surgery or other costly and even dangerous procedures before the necessity for the procedure could be determined.

Conversion privileges have a bearing on the interpretive question. A provision entitling an employee to convert to an individual policy that will cover pre-existing conditions (conditions whose onset precedes the end of coverage under the original plan) would be otiose if all expenses arising from such a condition were covered by the original plan regardless of when the expenses were actually incurred. Such a provision might be aimed at cutting off what could be a vast overhanging liability—for imag-

ine if, instead of the automobile accident, one of Fuller's boys had become ill with a chronic debilitating disease, the expenses of treating which would stretch into the distant future. The overhang would be prevented, yet the employee protected, by combining a cut off of benefits when coverage ceases with an entitlement to convert to a plan that covers pre-existing conditions.

The Board's plan contains no conversion privilege, however, thereby creating a puzzle as to what it meant for Fuller to elect not to convert to an individual policy when he left the Board's employ, and what it meant for the Board after the accident to permit him to rescind that election and purchase such a policy—which covered pre-existing conditions, and hence the boys' medical expenses, although not so generously as the Board's plan would have done. The first question is easier to answer than the second. By "electing" not to "convert," Fuller in effect decided to take his chances over the weekend. By what authority the plan authorized him to "convert" is unanswerable on the record in this case. The handbook that the Board gave all employees, including Fuller, summarizing the provisions in the employee medical plan, states: "You may choose to buy an individual medical expense policy if you leave the [Board]. You must elect to purchase your policy within 31 days from the date your employment terminates." This just deepens the puzzle. Anyone can buy an individual policy when his group coverage terminates; why must he do so within 31 days? The plan is silent on these questions.

The answer may conceivably lie in the provisions of ERISA, added in 1986, that require a plan to provide conversion privileges. 29 U.S.C. §§ 1161–1168. However, the plan is not on its face in compliance with this duty, because it contains no reference to conversion, although the plan summary alludes to conversion. Another possibility is that the 1986 amendments were not yet in effect when Fuller had his accident. We need not pursue these issues (on which the parties' briefs are deafeningly silent). Even without such support as the

plan might derive from a conversion privilege (whether voluntarily adopted, or forced on the plan by the statute) that covered pre-existing conditions, the plan's interpretation of "incurred" is not so unreasonable that we can reject it. The handbook states that an expense is incurred when the medical procedure for which it is incurred is administered, so that the treatment of Fuller's boys after they ceased to be covered persons was excluded. In the event of a conflict between handbook and plan, the former may trump—clearly so, when it is the employee relying on the handbook, for it is hardly realistic to expect him to read further. *Edwards v. State Farm Mutual Automobile Ins. Co.*, 851 F.2d 134, 136 (6th Cir.1988). There is no conflict between plan and summary in this case, and we do not see why the handbook cannot be used to fill an interpretive gap— and remember that we are reviewing the trustees' interpretation under a deferential standard.

Fuller directs us to a provision of the plan that "all injuries sustained in one accident and all illnesses resulting from such injuries shall be considered as a single condition." The function of this provision is another mystery unilluminated by the briefs, because nothing in the plan turns on the number of conditions a covered person has. But we do not read the provision to mean that all *expenses* arising from one accident shall be covered even if they are incurred after coverage has ended; and certainly the plan was not required to read the provision that way.

Fuller has two more arguments. The first is that he is entitled to the protection of an Illinois statute that requires an employer to offer a conversion policy that is as good as the policy from which the employee is converting. Ill.Rev.Stat. ch. 73, ¶ 979e. We need not decide whether, as the plan argues, the statute is preempted, for by its own terms it excludes employee benefit plans that are offered by the employer itself, as here, rather than by an insurance company. Fuller seems to be arguing that we should deem only the latter provision (the exclusion) preempted!

We can imagine no rational basis for such a result.

■ Fuller's last argument has merit, however, and requires a remand. The plan allows the trustees, within their "sole and exclusive discretion," to continue any of the benefits under the plan for up to six months after coverage has ended by the terms of the plan. The trustees exercised their discretion against Fuller. So far, so good; their discretion is sole and exclusive. Another provision of the plan, however, requires that all the trustees' "decisions ... shall be uniformly and consistently applied to all employees in similar circumstances," and Fuller contends (with some backing from a deposition) that the trustees violated this provision by extending benefits for three other employees in circumstances materially indistinguishable from his. The trustees denied this but have presented no affidavit or other evidentiary materials in support of their denial, thus committing the symmetrical default to Fuller's on the cost-allocation issue. The district judge thought that while a practice can sometimes give rise to an entitlement, *Petrella v. NL Industries, Inc.*, 529 F.Supp. 1357, 1362 (D.N.J.1982), the treatment of three employees is too limited a sample of the employer's behavior to constitute a practice. Maybe so; but the source of obligation here, if any, is not a practice (nor need we decide when if ever a practice *can* give rise to an entitlement); it is an express requirement of uniform treatment. The scope of that requirement requires further exploration in the district court.

The grant of summary judgment on the question whether the trustees violated the uniformity provision of the plan by refusing to extend Fuller's (dependent) benefits for six months was premature, and is reversed; in all other respects the judgment of the district court is affirmed. No costs in this court.

AFFIRMED IN PART, REVERSED IN PART.