Nick RUSSO, Plaintiff,

v.

HEALTH, WELFARE & PENSION FUND, LOCAL 705, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Defendant.

No. 90 C 2587.

United States District Court, N.D. Illinois, E.D.

Nov. 15, 1991.

Donald L. Bertelle, Chicago, Ill., for plaintiff.

Sherman Carmell, Carmell, Charone, Widmer, Mathews & Moss, Chicago, Ill., for defendant.

MEMORANDUM OPINION
AND ORDER

ZAGEL, District Judge.

This is a dispute over the size of Nick Russo's pension check. He is now paid, and will be as long as he lives, about half the amount he believes is his due. The facts,[1] in brief, are these:

---

1. For purposes of summary judgment I adopt as fact, paragraphs 1–2, 4, 6, 9–10, 20–25, 27–36, 11–17 of defendant's Rule 12(m) statement—all admitted by plaintiff. I adopt also paragraphs 36–50 of plaintiff's Rule 12(n) statement—these allegations are not admitted by defendant. For purpose of this motion, I assume the truth of paragraphs 36–50. Plaintiff's paragraphs 51–55 are rejected since they state not facts but legal conclusion. I further accept defendant's paragraphs 3, 5, 7, 8 and 11 as matters not effectively in dispute. Finally, I accept plaintiff's paragraphs 18, 19 and 26 as modified by the plaintiff in his 12(n) statement.

Nick Russo was a teamster, covered under Local 705 Pension Fund. The Fund is a multi-employer pension system organized under the terms of ERISA. Benefits are paid under a plan adopted in 1976 by the fund trustees. By 1981, Russo had become disabled. He eventually received disability benefits from the Social Security Administration. In 1983 when Russo was 54 years of age he sought a pension benefit from the Local 705 Fund. He had over twenty years of vesting service. The 1976 Plan had four types of pensions, two of which matter here: 1) early pension (age 57 with 20 years service) and (2) disability (total disability with 15 years of service). Russo was given a disability pension. Before Russo applied for the pension he went to see Louis Peick, long-time Secretary–Treasurer (and administrator of its fund). At his meeting with Peick (and Joe Desmyter) Russo spoke of his problems. Peick said, "You come back and show me them papers from the government that you got social security and I'll give you your disability. And when you become of age I'll put you on your pension." Russo asked, "Is that it, Louie? Is it cut and dry?" Peick said, "Yes." Russo said, "So long, pal." [2]

Sometime after Peick died Dan Ligurotis succeeded him in office. Nick Russo sought to change from disability pension to the higher early retirement pension. He was told no, "You take disability, you are on disability." A written request for such a change was made in April 1988 and denied in writing by Ligurotis. In August 1989 Russo's lawyer wrote requesting an early retirement program and in his letter, recited the statement of Peick to his client. A written denial was made. The denial was appealed to the fund trustees before whom Russo and his attorney appeared. The minutes of the hearing reflect consideration of all the relevant facts including Russo's current financial difficulties. The trustees affirmed the administrator's decision.

The ground for rejection of Russo's claim was the language of the 1976 Plan:

An employee shall be eligible for an Early Pension upon retirement on or after his 57th birthday and completion of 20 or more years of Vesting Service.

The administrator and then the trustees construed this to mean: early pension is available *only* to those who retire on or after the 57th birthday. Russo retired before his 57th birthday and, for this reason, could never comply with the conditions for Early Pension.

Under the Trust Agreement all "questions ... as to any claim for any benefits ... or ... as to the construction of the language or the meaning of the pension plan ... shall be submitted to the Trustees ... and the decision of the Trustees shall be binding." The 1976 Plan contains similar language. So the trustees have discretion to construe the terms of the Plan and judicial review of their decision is quite limited. *Fuller v. CBT*, 905 F.2d 1055, 1058 (7th Cir.1990). And here it is clear that challenged interpretation is reasonable. The Plan language may reasonably be read to require that "retirement on or after his 57th birthday" occur as a precondition to an early pension. This is particularly so because the Plan specifically provides deferred vested retirement for one who retires before age 57. *See Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210 (6th Cir.1987).

None of this is seriously contested. Russo says that Peick's statements defeat the defendant's right to summary judgment in a variety of ways:

(a) Peick's statement shows the Plan was not uniformly construed.

 The absence of uniform construction is evidence of arbitrary action by trustees. *Fuller v. CBT, supra.* The flaw in

---

**2.** Defendants *assume* that this conversation took place; they do not concede the statement was made. They note that Desmyter retired in January 1980 and would not have been with Peick in 1982. Moreover they note that Russo became "of age" in June 1985 but did not seek to change his pension until 1987 after the death of Peick in November 1986 (and of Desmyter in 1985) and no one was left to contradict him. When asked why he did not get it in writing Russo said, "[h] would have put me out the third floor window. You don't talk that way to Louie Peick."

Russo's position is that there is no evidence that anyone ever was allowed to switch from disability to early pension. The one witness who was asked about the matter said he did not know of such a switch "under Nick Russo's circumstances" and "would be very surprised" if it had ever occurred. A statement by Peick that he "would" permit a switch is not an interpretation of the Plan unless it is acted upon—a promise to interpret is not an interpretation.

(b) Peick's statement estops the defendant from adopting the interpretation it applied to Russo.

■ The use of estoppel in pension fund administration has always troubled courts. If an administrator, through carelessness or collusion, may bind a pension fund to pay what it should otherwise not pay, the financial security of the pension fund is endangered. A remedy against the personal estate of the administrator may well be inadequate. *See Reiherzer v. Shannon,* 581 F.2d 1266, 1267 (7th Cir.1978) (estoppel principles not to be used in pension plan cases).

The equitable appeal of estoppel claims, however, may be quite strong and in *Black v. TIC Investment Corp.,* 900 F.2d 112, 115 (7th Cir.1990) the Court retreated from *Reiherzer* holding that "estoppel [applies] to claims ... under unfunded single employer ... plans under ERISA" and expressing "no opinion as to ... estoppel ... in other situations." Of course, an unfunded single employer plan does not ordinarily involve the same concerns for actuarial soundness that are inextricably linked to the operation of funded multi-employer plans.

The Plan here is funded and it is a multi-employer plan. Yet there is but one administrator so the danger of allowing estoppel is lessened. In *Black,* the Court observed:

[where] the plan has multiple fiduciaries with control over a common fund ... [allowing] one employer to bind the fund to pay benefits outside the strict terms of the Plan would be to make all the employers pay for one employer's misrepresentations, and to the extent that such payments damage the actuarial soundness of the Plan, it hurts all the employees as well. It could even encourage employers to make intentional misrepresentations so as to bind the Plan to make improper payments in favor of their own employees ...

*Id.*

It is true that there are multiple trustees (from both union and management) and there is a risk that individual trustees could make misrepresentations to employees. But the structure of the Plan puts the authority to administer in one person. To say that a single administrator could by estoppel bind the Plan is not to say that each individual trustee may do so. Indeed, the Plan empowers the administrator to decide all questions; absent appeal, the trustees do not consider the matter. This is not a case where multiple beneficiaries may bind the Plan and the existing structure does not inherently lend itself to acts which favor one employer's workers over another's.

The rule in *Black* is this: "[w]here there is no danger that others associated with the Plan can be hurt, there is no good reason to breach the general rule that misrepresentations can give rise to an estoppel." *Id.* Russo concedes that (and thus waives objection to) an order which requires him to disgorge disability benefits paid prior to age 57 as a condition of his receipt of early pension—thus preventing an unjust double recovery and protecting the fund's assets. This concession seems to put Russo under the rule in *Black.*

But perhaps the rule in *Black* is not so clear. After all, the Court justified its rule by saying: "There is no reason for the employee who reasonably relied to his detriment on his employer's false representations to suffer. There is no reason for the employer who misled its employee to be allowed to profit from the misrepresentation." *Id.* Here there is no employer profit. Whether *Black* would permit estoppel in this case is a difficult question. It may not have to be answered if the elements of

estoppel are not met.[3]

To prove estoppel Russo must prove that Peick, with the intent that Russo act on Peick's statements, misrepresented a material fact knowing it to be untrue, and that Russo did not know the truth and relied on Peick's statements to his own detriment. On the facts accepted here, Russo did not know what the Plan meant, and Peick gave him advice with the intent that Russo act upon it and the advice was materially in error. Whether Peick knew he was wrong is unclear on this record, but I assume he did.

Defendant says Russo did not rely on Peick, reasonably or otherwise, to his detriment. At the time, Russo spoke with Peick the only way he could have gotten any money was to take disability so the disability pension clearly was the "financially advantageous choice." Russo was thus not hurt by taking disability. But Russo, by taking disability, lost forever his right to seek a deferred vested pension. He did not lose a right to an early pension, under the trustees' interpretation of the Plan he never had the right[4] to such a pension.

The choice Russo made led to the receipt of $8,430 that he would not have otherwise received. Through June 1991 he has received $31,931 as a result of his choice of disability. Had he waited until age 57 to collect a deferred pension (the only other choice really available to him when he spoke to Peick) he would have received $21,307.81 through June 1991. And he would not catch up. The monthly deferred pension was always lower than the disability pension and the gap between them today is quite large—over $120 a month.

In short, there is no estoppel here because there is no detriment. If Peick had told Russo the truth, Russo could not have done better than he already has done.[5] The federal law claim must fail on the merits. The state law claims of estoppel, breach of fiduciary duty and misrepresentation are all preempted by ERISA, *Lister v. Stark*, 890 F.2d 941 (7th Cir.1989).

---

3. Nor will I need to decide whether the estoppel argument is defeated by the rule regarding oral modifications of pension plans. Written pension plans cannot be orally modified under ERISA, but one Court has distinguished between oral modifications and oral interpretations—the former are precluded and the latter are not. *National Companies Health Benefit Plan v. St. Joseph's Hosp.*, 929 F.2d 1558, 1571–72 (11th Cir.1991). I need not decide whether there is a valid distinction between modification and interpretation—the distinction may be a

linguistic cul de sac like that between a rule and its exceptions.

4. He could have acquired such a right, perhaps, by returning to work and retiring on his 57th birthday or some day thereafter.

5. There is, understandably, no claim that Russo recovered from his disability and could have returned to work in order to retire after his 57th birthday and would have done so if he had not been laboring under Peick's bad advice.