**UNUM LIFE INSURANCE COMPANY OF AMERICA, Plaintiff,**

v.

**Noel F. NARUT, Defendant.**

**No. 04–C–175.**

United States District Court,
E.D. Wisconsin.

March 29, 2005.

---

Matthew S. MaClean, Paul E. Benson, Milwaukee, WI, for Plaintiff.

## ORDER

STADTMUELLER, District Judge.

Before the court are cross-motions for summary judgment filed by the above-mentioned parties pursuant to Fed. R.Civ.P. 56(c). Also before the court is a motion for a protective order filed by defendant Noel Narut pursuant to Fed. R.Civ.P. 26(c). The matters are fully briefed, and for the reasons that follow, the motion for summary judgment filed by plaintiff UNUM Life Insurance Company of America ("UNUM") will be granted in part and denied in part; Narut's motions for summary judgment and for a protective order will be denied.

## FACTUAL BACKGROUND

Fort Atkinson Memorial Hospital maintains an employee benefit plan (hereafter referred to as the "Plan") that provides long-term disability benefits to eligible employees. The benefits under the Plan are funded, at least in part, by a group policy of long term disability insurance issued by UNUM. The Plan is a welfare benefit plan arising under the ERISA, 29 U.S.C. § 1001, *et seq.*

The following are the relevant provisions of the Plan. An insured is "disabled" or has a "disability" within the meaning of the Plan if because of "injury or sickness,"

1. the insured cannot perform each of the material duties of his regular occupation; or

2. the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:

   a. performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and

   b. earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness.

(Plan, at L–DEF–4.) Thus, whether an insured is disabled within the meaning of the Plan hinges on his earnings. An insured who is disabled within the meaning of the Plan will continue to receive disability benefits so long as he provides proof of his continuing disability:

When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives to the Company proof of continued:

1. disability; and

2. regular attendance of a physician.

The proof must be given upon request at the insured's expense. The monthly benefit will not:

1. exceed the insured's amount of insurance; nor

2. be paid for longer than the maximum benefit period.

(*Id.* at L–BEN–1.) An insured who is disabled under the Plan and provides proof of his continuing disability receives monthly benefits calculated in the following manner:

1. Take the lesser of:

   a. 66⅔% of the insured's basic monthly earnings; or

   b. the amount of the maximum monthly benefit shown in the policy specifications; and

2. Deduct other income benefits, shown below, from this amount.

But if the insured is earning more than 20% of his indexed pre-disability earnings in his regular occupation or another occupation, then the monthly benefit will be figured as follows:

1. During the first 12 months, the monthly benefit will not be reduced by any earnings until the gross monthly benefit plus the insured's earnings exceed 100% of his indexed pre-disability earnings. The monthly benefit will then be reduced by that excess amount.

2. After 12 months, the following formula will be used to figure the monthly benefit.

   (A divided by B) x C

   A = The insured's "indexed pre-disability earnings" minus the insured's monthly earnings received while he is disabled.

   B = The insured's "indexed pre-disability earnings".

   C = The benefit as figured above.

The benefit payable will never be less than the minimum monthly benefit shown in the policy specifications.

Proof of the insured's monthly earnings must be given to the company on a quarterly basis. Benefit payments will be adjusted upon receipt of this proof of earnings.

(*Id.* at L–BEN–1 through L–BEN–2.) Thus, the calculation of benefits also hinges on the insured's earnings. UNUM is the "Company" within the meaning of the Plan, and the Plan expressly gives UNUM the discretionary authority to construe its terms:

> In making any benefits determination under this policy, the Company shall have the discretionary authority both to determine an employee's eligibility for benefits and to construe the terms of this policy.

(*Id.* at L–1 and L–PS–3.)

Narut is an insured under the Plan, and after he submitted a disability claim, UNUM found he was disabled. The onset date of Narut's disability was September 21, 1998.

In a letter dated June 9, 2000, Billy Hardy, a disability specialist with UNUM, informed Narut he needed to submit verification of his work earnings so UNUM could accurately calculate his benefits. The letter stated in relevant part:

> We need some form of verification of your work earnings in order to accurately calculate your benefits. An example of this documentation would include payroll printouts or paycheck stubs. Please remember to submit earnings information at least on a monthly basis. Your annual earnings need to be verified by complete copies of your Federal Income Tax returns.

(Gann Decl. ¶3, Exh. 2.) In a follow-up letter dated July 14, 2000, Hardy informed Narut UNUM had not received Narut's tax returns. (*Id.* ¶4, Exh. 3.)

In a letter dated February 11, 2002, Ashley Pruitt, a customer care specialist with UNUM, notified Narut that UNUM

needed an accurate account of his earnings in 2000 and 2001, and she explained income tax returns were the most reliable documents he could provide:

> The most reliable documentation of earnings is a claimant's complete tax return. Unlike other sources of financial information, tax returns are signed under the penalty of perjury and, therefore, guarantee the highest level of assurances as to accuracy and completeness.

(*Id.* ¶ 5, Exh. 4.) Pruitt further informed Narut that UNUM would treat his tax returns with confidentiality:

> We understand that you may be concerned with providing UNUM Provident with access to this financial information. Please be assured that our business is to review confidential information and protect the privacy rights of all of our claimants. We will not disclose confidential information about you that we obtain in the course of our claims investigation unless authorized by you, or unless we are required to do so pursuant by subpoena or court order.
>
> In conclusion, please provide us with the completed supplemental forms and tax returns documentation for 2000 and 2001 by March 31, 2002.

(*Id.*) Narut did not provide UNUM with his income tax returns for 2000 or 2001 by March 31, 2002.

On February 25, 2002, Narut completed and submitted a document to UNUM entitled "Claimant's Supplemental Statement," in which he stated he had begun to work part-time. (*Id.* ¶ 13, Exh. 12.)

In a letter dated December 2, 2002, Meg Murray, a senior customer care specialist with UNUM, informed Narut that UNUM received the W–2 forms he submitted, and she requested Narut also submit a copy of his 2001 federal income tax return. (*Id.* ¶ 6, Exh. 5.) Murray explained UNUM needed his income tax returns to determine whether he was still eligible for benefits. (*Id.*) Narut did not provide UNUM with a copy of his 2001 tax return.

In April 2003, Narut submitted another supplemental statement to UNUM in which he reported he was working 6 hours per week as a "consultant in child psychiatry" and 2 hours per week in a "private clinic for child psychiatry." (*Id.* ¶ 14, Exh. 13.) In a letter dated November 24, 2003, Lakeview Rehab Center confirmed to UNUM that Narut was working approximately 6 hours per week as a contract physician in child psychiatry. (*Id.* ¶ 15, Exh. 14.)

In a report dated May 30, 2003, International Claims Specialists provided UNUM with a summary of surveillance it conducted of Narut over a 5–day period covering May 19, 2003, through May 21, 2003, and May 29, 2003, through May 30, 2003. (*Id.* ¶ 9, Exh. 8.) The report stated on May 29, 2003, Narut was observed at his Federal Aviation Administration ("FAA") medical services examiner office. (*Id.*) UNUM contacted the FAA regarding Narut's work activities, and in a letter which appears to have been dated October 28, 2003, the FAA reported the following to UNUM:

1. Dr. Narut is a physician designated as an Aviation Medical Examiner by the Federal Aviation Administration to perform exams for commercial and private pilots as well as Airline Transport pilots.

2. Dr. Narut was designated as an Aviation Medical Examiner for the Federal Aviation Administration on July 1, 1978.

3. Based on the period of April 1, 2002, through March 31, 2003, Dr. Narut performed an average of 23 exams per month.

(*Id.* ¶ 10, Exh. 9.)

In a letter dated November 20, 2003, Murray informed Narut it was UNUM's

understanding that Narut was involved.in a pilot program performing flight exams. (*Id.* ¶ 11, Exh. 10.) Murray informed Narut that UNUM needed information about that program. (*Id.*) Specifically, UNUM wanted to know if Narut was currently performing exams, and if so how often and at what level of compensation. (*Id.*)

In an internal UNUM document designated as a "CPA Team Claim Referral" and dated October 2, 2003, Murray asked an examiner for UNUM to explain why it was necessary for UNUM to demand Narut submit his federal income tax returns. (*Id.* ¶ 12, Exh. 11.) The examiner explained UNUM needed Narut's returns because it appeared he was not reporting income from the FAA. (*Id.*) The examiner's handwritten notes stated in relevant part as follows:

> The W–2 for 2001 in the file is from new affiliated Hospital and a 1099 from Lake View Neuro Rehab Center. It appears the insured is also the owner of Aviation Medical Services. We need the 1040 to determine all sources of the Insured's earned income. Without the 1040, we cannot determine if we have all of the W–2's [*sic*] or 1099's [*sic*] received by the [insured].

(*Id.*)

In a letter dated January 12, 2004, Murray informed Narut that UNUM had not received the additional information requested in the letter dated November 20, 2003. (*Id.* ¶ 16, Exh. 15.) Murray asked Narut to report whether he was currently performing flight exams, the number of flight exams he performed each month during the years 2002 and 2003, how many years he has been performing flight exams, and the average annual income he received for performing flight exams. (*Id.*) Murray requested Narut submit this information no later than February 12, 2004. (*Id.*) There is nothing in the record to indicate Narut submitted this information to UNUM by February 12, 2004.

Narut admits·in his pleadings that he is certified as an aviation medical examiner by the FAA and has worked and continues to work as an aviation medical examiner. (Ans.¶ 16.) He also admits he is compensated for his work as an aviation medical examiner and conducts aviation medical exams through his business, Aviation Medical Services. (*Id.*)

UNUM has paid disability benefits to Narut from September 21, 1998, to the present. (*Id.* ¶ 19.) Narut states he has submitted W–2s and 1099s to UNUM on more than one occasion during this time period, and he states UNUM has continually informed him that his W–2s and 1099s are insufficient and that it also wanted his tax returns. (Narut Aff. at ¶¶ 3, 4.) Narut states during all times relevant to this lawsuit, he has filed his tax returns under the classification of "married filing jointly," and he swears his wife is unwilling to sign a "Form 4506 authorization that would allow the release of" the joint returns. (*Id.* at ¶¶ 5, 6.)

On February 18, 2004, UNUM filed a complaint against Narut requesting relief from this court in three ways. First, UNUM asks this court declare UNUM has the power under the Plan to demand Narut submit his income tax returns. (Compl., at 9.) Second, UNUM asks this court to order Narut provide UNUM with copies of his personal and business federal and state income tax returns for the years 2001, 2002, and 2003, as well as for future years during which Narut continues to seek benefit under the Plan. (*Id.*) Third, UNUM asks this court to declare UNUM has the right to cease paying Narut benefits under the Plan unless and until he submits these tax returns. (*Id.*)

On September 7, 2004, Narut filed a motion for summary judgment pursuant to

Fed.R.Civ.P. 56(c) on the ground UNUM does not have the power under the Plan to demand he provide his income tax returns. Narut has also filed a motion for a protective order pursuant to Fed.R.Civ.P. 26(c) on the ground his tax returns are not discoverable in this lawsuit.

On October 14, 2004, UNUM filed its own motion for summary judgment pursuant to Rule 56(c) on the grounds it is entitled to a declaration from this court that it has the power to demand Narut's income tax returns and that it is entitled to an order from this court directing Narut to produce these returns.

## JURISDICTION, VENUE, AND STANDARD OF REVIEW

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2). The court may grant summary judgment "if the pleadings, deposition, answers to interrogatories, and admission on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

## DISCUSSION

The court will grant summary judgment on UNUM's claim that it is entitled to a declaration from this court that it has the power to demand Narut produce his income tax returns. The Plan, which arises under ERISA, expressly grants UNUM the discretion to interpret its terms. Thus, the court's role is limited to determining whether UNUM's interpretation of its powers under the Plan is arbitrary and capricious. *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1147 (7th Cir.1998). UNUM's interpretation of the Plan is arbitrary and capricious only if it is downright

unreasonable. *Fuller v. CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir.1990).

Under UNUM's interpretation of the Plan, when UNUM has reason to believe an insured is not reporting all of his yearly earnings, the insured has not met his burden of proof of earnings unless he submits his income tax return. The court cannot conclude this interpretation is downright unreasonable. UNUM must have accurate information concerning the insured's yearly earnings to determine whether the insured is disabled, and if so, to calculate and adjust the insured's benefits. When an insured only submits W–2s and 1099s, the only basis upon which UNUM can conclude the insured has met his burden of proof of earnings is a good faith belief that the insured is not withholding earnings information. When UNUM has a good faith basis to believe the insured *is* withholding earnings information, UNUM is more than justified in demanding the insured verify he has submitted *all* of his W–2s and 1099s by also submitting an income tax return. An income tax return reliably verifies whether an insured has provided *all* of his W–2s and 1099s because the insured cannot knowingly understate his earnings therein without perjuring himself. In this case, UNUM had a good faith basis to believe Narut had been withholding earnings from the FAA, and it was, therefore, more than reasonable for UNUM to conclude Narut needed to prove his earnings by providing an income tax return.

Narut, nonetheless, maintains UNUM's interpretation of the Plan is downright unreasonable. First, he argues UNUM has not been consistent in its interpretation of the Plan, and he supports his argument by directing the court to the portion of Hardy's June 9, 2000, letter wherein she states payroll printouts or paycheck stubs are examples of documents which can verify work earnings. But in that same letter,

Hardy hastened to add Narut would have to verify his annual earnings with complete copies of his federal income tax returns. Thus, contrary to Narut's assertion, this letter does not show UNUM has been inconsistent in its interpretation of the Plan.

Second, Narut argues the language in the Plan only requires he submit earning information on a quarterly basis, and he points out it would be impossible to submit income tax returns on a quarterly basis. However, the language in the Plan also grants UNUM the power to request information relating to his disabled status "upon request." (Plan, at L–BEN–1.) Because an insured's disabled status hinges upon his earnings, it was not downright unreasonable for UNUM to conclude it has the power to request Narut's income tax returns in a case where there was reason to believe he was under-reporting his earnings.

Third, Narut argues it is unreasonable to expect him to disclose his tax returns because his wife will not let him. Narut seems to believe IRS Form 4506 requires signatures from both spouses to disclose a joint income tax return; however, the form states "[i]f the request applies to a joint return, either husband or wife must sign," and the instructions for completing Form 4506 explicitly state only one signature is required:

> Copies of jointly filed tax returns may be furnished to either spouse. Only one signature is required. Sign form 4506 exactly as your name appeared on the original return. If you changed your name, also sign your current name.

(Mac Kelly Aff. ¶ 2, at Exh. 1.) Thus, Narut fails to demonstrate the necessity of securing his wife's permission in order to disclose his income tax returns to UNUM.

Finally, Narut argues UNUM is barred from requesting his tax returns under the public policy embodied in 26 U.S.C. § 6103. However, this statute only applies to governmental entities, not private entities like UNUM. *See, e.g., Solargistic Corp. v. U.S.*, 921 F.2d 729, 730 (7th Cir. 1991). As such, Narut fails to show that this statute precludes UNUM from requesting his returns.

In light of the foregoing, the court is obliged to grant UNUM's motion for summary judgment on its first claim for relief and declare it has the power under the Plan to demand Narut submit his personal and business federal and state income tax returns for the years 2001, 2002, and 2003, as well as for future years during which Narut continues to seek benefits under the Plan. Consequently, Narut's motion for summary judgment will be denied.

The court will not, however, grant summary judgment on UNUM's claim that it is entitled to a court order directing Narut to produce his tax returns. UNUM has not met its burden of showing it is entitled to such an order as a matter of law, and UNUM's motion for summary judgment on its second claim for relief must, therefore, be denied.

Finally, the court has considered the offers by UNUM and Narut to weigh in on whether Narut's income tax returns are discoverable under the Federal Rules of Evidence, and it respectfully declines to do so. There is nothing in the record to show UNUM has formally demanded that Narut produce his tax returns pursuant to any discovery rule, and UNUM certainly has not filed a motion asking this court to compel their production along with a written statement pursuant to Civ. L.R. 37.1 (E.D.Wis.). Similarly, Narut has not accompanied his motion for a protective order with a written statement pursuant to Civ. L.R. 37.1. As such, these discovery issues are not ripe for decision.

Accordingly,

IT IS ORDERED that Narut's motion for summary judgment (Docket # 10) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that Narut's motion for a protective order pursuant to Fed.R.Civ.P. 26(c) (Docket # 10) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that UNUM's motion for summary judgment (Docket # 15) be and the same is hereby GRANTED as to UNUM's first claim for relief and DENIED as to UNUM's second claim for relief; and

IT IS FURTHER ORDERED that UNUM be and the same is hereby ENTITLED to a declaration that it has the power under the Plan to demand copies of Narut's personal and business federal and state income tax returns for the years 2001, 2002 and 2003, as well as for the future years during which Narut continues to seek benefits under the Plan.