# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

FILED

**January 27, 1999**

**Cecil W. Crowson
Appellate Court Clerk**

DANIEL WHITE,  )
                        )
    Plaintiff/Appellant,  )
                        )
                        )   Davidson Juvenile
VS.  )   No. 147-1238-93
                        )
                        )   Appeal No.
BRENDA ARMSTRONG,  )   01A01-9712-JV-00735
                        )
    Defendant/Appellee.  )

APPEAL FROM THE JUVENILE COURT
FOR DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE ANDREW J. SHOOKHOFF, JUDGE

For Plaintiff/Appellant:

Clark Lee Shaw
Nashville, Tennessee

Cynthia Bohn
Nashville, Tennessee

For Defendant/Appellee:

John Knox Walkup
Attorney General and Reporter

Sue A. Sheldon
Assistant Attorney General

## REVERSED AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# O P I N I O N

This appeal involves a man's efforts to obtain post-judgment relief from an order requiring him to support a child who is not his own. Over three years after voluntarily legitimating the child, the man filed a motion in the Davidson County Juvenile Court seeking to terminate his responsibility to support the child on the ground that genetic testing had excluded the possibility that he was the child's biological father. The juvenile court declined to relieve the man of his support obligation after concluding that the child's mother had not fraudulently persuaded the man that he was the child's biological father and that the man and the child's mother had perpetrated a fraud on the court in obtaining the original legitimation order. We have determined that the evidence does not support the juvenile court's conclusion that the man willfully perpetrated fraud on the court during the original legitimation proceeding. Accordingly, we find that he is entitled to post-judgment relief because it is no longer equitable that the legitimation order be given prospective application.

## I.

Daniel White and Brenda Armstrong lived together as husband and wife. While they were living together, Ms. Armstrong gave birth to two sons. Daniel White, Jr. was born in June 1991, and Juwan White was born in November 1992. Mr. White had no reason to believe that he was not the biological father of these children, and so he and Ms. Armstrong began raising the children together. Soon after her second son was born, Ms. Armstrong revealed to Mr. White during an argument that we was not Juwan White's biological father.[1] Mr. White was hurt and saddened by the news, and shortly thereafter, he and Ms. Armstrong separated. Ms. Armstrong moved out of the house she and Mr. White shared and took the two children with her.

Following the separation, Mr. White filed a pro se petition in the Davidson County Juvenile Court to legitimate Daniel. Mr. White and Ms. Armstrong differ concerning the motivation for this petition. For his part, Mr. White asserts that he believed that Daniel was his son and that Ms. Armstrong had assured him that he was. He also stated that he waived his right to insist on blood, genetic, or DNA testing because he "was going through a lot at that time, and I didn't want to know." For her part, Ms. Armstrong asserts that she "sat down and talked to him" and "told him that this child I was carrying, I don't know who the father is, but I know he wasn't." On January 5, 1994, a juvenile court referee entered an order declaring Mr. White to be Daniel's biological father and setting his child support obligation

_____

[1] In March 1995, the juvenile court entered an order in a separate proceeding finding that Andrew Martindale is Juwan White's biological father.

at $264 per month. The referee also ordered Mr. White to pay Ms. Armstrong $4,847 in back child support and established his visitation rights with the boy.

Mr. White paid his support regularly and exercised his visitation rights with the child. Several years later, after Daniel repeatedly told Mr. White that he had two fathers, Mr. White decided that he would try to find out the truth. According to Mr. White, Ms. Armstrong told him that Kevin Robinson was Daniel's biological father when he called her seeking permission to have the child tested.[2] After the juvenile court denied Mr. White's request for blood, genetic, or DNA testing in October 1997, Mr. White obtained genetic testing on his own. The test categorically excluded the possibility that Mr. White could be Daniel's biological father.

Armed with this evidence, Mr. White filed a pro se motion in the juvenile court to terminate his obligation to support Daniel. He later retained counsel who filed an "amended motion to stop child support" alleging that Ms. Armstrong had fraudulently persuaded Mr. White to legitimize Daniel in 1993. Following a hearing in November 1997, the juvenile court declined to relieve Mr. White of his support obligation because he had "willingly undertook" it and because Mr. White and Ms. Armstrong had "perpetrated a fraud upon the Court" when they obtained the 1994 legitimation order.

## II.

This appeal stands at the intersection of three fundamental policies. The first is the policy disfavoring reopening cases after they have become final;[3] the second is the policy disfavoring granting relief to persons either who come into court with unclean hands or who are responsible for their own misfortune;[4] and the third is the policy requiring biological parents, above anyone else, to assume the responsibility to support their children.[5] The first two policies advance the goal of fairly apportioning limited judicial resources; while the third

---

[2]Later, at the hearing on Mr. White's post-judgment motion, Ms. Armstrong denied that she told Mr. White that Kevin Robinson was Daniel's father and asserted that she did not know who the child's biological father was.

[3]*See Toney v. Mueller Co.*, 810 S.W.2d 145, 146 (Tenn. 1991); *Jerkins v. McKinney*, 533 S.W.2d 275, 280 (Tenn. 1976).

[4]*See Knox-Tenn Rental Co. v. Jenkins Ins., Inc.*, 755 S.W.2d 33, 39-40 (Tenn. 1988); *Swartz v. Atkins*, 204 Tenn. 23, 28-29, 315 S.W.2d 393, 395 (1958); *Redwine v. Metropolitan Life Ins. Co.*, 178 Tenn. 83, 85-86, 156 S.W.2d 389, 390 (1941); *Farmers & Merchants Bank v. Templeton*, 646 S.W.2d 920, 924 (Tenn. Ct. App. 1982).

[5]*See* Tenn. Code Ann. § 34-11-102(b) (1996); *Smith v. Gore*, 728 S.W.2d 738, 750 (Tenn. 1987); *Hall v. Jordan*, 190 Tenn. 1, 11, 227 S.W.2d 35, 39 (1950); *Brooks v. Brooks*, 166 Tenn. 255, 256, 61 S.W.2d 654, 655 (1933).

policy reflects ancient, common-law beliefs concerning the role and responsibility of parents. In most circumstances, advancing the third policy should take precedence over the first two.

## A.

We must first identify the procedures available for obtaining post-judgment relief from legitimation orders in juvenile court. While one would think that this inquiry would be straightforward, it is complicated by the fact that, at the time of these proceedings, there were different procedures governing paternity and legitimation actions.[6] Both actions could be filed in juvenile court; however, paternity actions were governed by Tenn. Code Ann. §§ 36-2-101, -115 (Repealed 1997), while legitimation actions were governed by Tenn. Code Ann. §§ 36-2-201, -210 (Repealed 1997). Legitimation proceedings were less formal than paternity proceedings and were generally uncontested because until 1996 they could not be filed without the mother's consent. *See* Tenn. Code Ann. § 36-2-202(c).[7]

Tenn. R. Juv. P. 1(b) provides that "all paternity cases" are governed by the Tennessee Rules of Civil Procedure. Thus, motions for post-judgment relief from paternity orders are governed by Tenn. R. Civ. P. 60. *See Tennessee Dep't of Human Servs. v. Johnson*, Shelby Juv., 1986 WL 1873, at * 3 (Tenn. Ct. App. Feb. 11, 1986) (No Tenn. R. App. P. 11 application filed). While Tenn. R. Juv. P. 1(b) does not explicitly include legitimation proceedings, we construe the phrase "all paternity cases" to mean all proceedings in juvenile court in which a child's paternity is at issue. Therefore, Tenn. R. Juv. P. 1(b) applies to both legitimation proceedings under the former statute and actions to establish parentage under Tenn. Code Ann. § 36-2-301 and these proceedings in juvenile court must be conducted in accordance with the Tennessee Rules of Civil Procedure.

Parties seeking post-judgment relief from a final judgment or order in a juvenile court proceeding involving a child's paternity must proceed in accordance with Tenn. R. Civ. P. 60. Unless the request for relief is governed by Tenn. R. Civ. P. 60.02(1) or 60.02(2), a motion seeking post judgment relief must be filed within a reasonable time. The court should employ equitable principles to determine whether a motion has been filed in a reasonable time and should consider, among other factors, (1) the circumstances under which the

---

[6]The General Assembly did away with these two actions in 1997 when it replaced them with a single action to establish parentage. *See* Act of May 29, 1997, ch. 477, 1997 Tenn. Pub. Acts 862, codified at Tenn. Code Ann. §§ 36-2-301, -322 (Supp. 1998).

[7]In 1996, this court held that the portion of Tenn. Code Ann. § 36-2-202(c) requiring the mother's consent violated the equal protection clauses of Tenn. Const. art. I, § 8 and U.S. Const. amend XIV, § 1. *See In re Hood*, 930 S.W.2d 575, 579-80 (Tenn. Ct. App. 1996).

original paternity order was entered, (2) the timing and circumstances of the previously adjudicated father's questioning that he was the child's father, (3) whether the previously adjudicated father presented or attempted to present the results of genetic, DNA, or blood testing; and (4) the burdens imposed on the previously adjudicated father and on the child by the continued enforcement or by the reopening of the judgment of paternity. *See Ex Parte Jenkins*, Nos. 1961520 & 1961531, 1998 WL 399866, at *8 (Ala. July 17, 1998).

Tenn. R. Civ. P. 60.02(4) permits courts to relieve a party from a final judgment when "it is no longer equitable that the judgment should have prospective effect." The relief available under Tenn. R. Civ. P. 60.02(4) applies to judgments that have prospective affect, not to those that remedy past wrongs. *See Maraziti v. Thorpe*, 52 F.3d 252, 254 (9th Cir. 1995); *In re Moody*, 849 F.2d 902, 906 (5th Cir. 1988).[8] This sort of relief is appropriate when a change of circumstances had occurred that would render continued enforcement of the judgment inequitable. *See DeFilippis v. United States*, 567 F.2d 341, 343-44 (7th Cir. 1977); *Keith v. Volpe*, 960 F. Supp. 1448, 1457-1458 (C.D. Cal. 1997).

The force behind Tenn. R. Civ. P. 60.02(4) is derived from the historic power of a court of equity to modify its decree in light of changed circumstances. *See* 10A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §2863, at 336 (2d ed. 1995). As Justice Cardozo recognized, "a court does not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong." *United States v. Swift & Co.*, 286 U.S. 106, 114-15, 52 S. Ct. 460, 462 (1932). Changes in circumstances warranting relief under procedures akin to Tenn. R. Civ. P. 60.02(4) include the passage of subsequent legislation, *see Protectoseal Co. v. Barancik*, 23 F.3d 1184, 1187 (7th Cir. 1994), a change in the decisional law, *see Thericault v. Smith*, 523 F.2d 601, 602 (1st Cir. 1975), and a change in operative facts. *See Small v. Hunt*, 98 F.3d 789, 797 (4th Cir. 1996).

When determining whether an order or judgment has prospective application, federal courts examine whether the order involves supervision by the court of changing conduct or conditions. *See Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 131 F.3d 625, 630 (7th Cir. 1997); *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1139 (D. C. Cir. 1988). A child support order certainly involves continued close supervision by the issuing court because the issuing court retains jurisdiction over the order to modify it in the event of a change in circumstances or to impose sanctions for failure to pay. The juvenile court's order directing Mr. White to pay child support for Daniel was just such an order of

---

[8]When Tennessee's procedural rules are patterned after federal rules, we may look to the federal courts' interpretation of analogous federal rules for helpful guidance in construing our own rules. *See Continental Cas. Co. v. Smith*, 720 S.W.2d 48, 49 (Tenn. 1986); *Bowman v. Henard*, 547 S.W.2d 527, 530 (Tenn. 1977).

prospective application because, under the applicable statutes at the time, it remained in the court's control so that the court could modify it as necessary upon the showing of a substantial and material change of circumstances. *See* Tenn. Code Ann. § 36-2-203(b)(2) (repealed 1997) (providing that support orders issued during a paternity proceeding were governed by the same provisions that deal with child support in the context of divorce or separation).[9] Accordingly, the juvenile court had the power to modify or vacate its January 5, 1994 order directing Mr. White to pay child support if it determined that it would no longer be equitable that this order have prospective effect.

**B.**

We turn next to the question of whether Mr. White should be prevented from pursuing relief from the juvenile court's January 5, 1994 order because he voluntarily legitimated Daniel in 1994. Under the facts of this case, we have concluded that Mr. White's actions in late 1993 and early 1994 should not prevent him from now seeking prospective judicial relief from his child support obligation.

Mr. White's motivation to legitimate Daniel in 1993 remains somewhat unclear. Accrediting his testimony, Mr. White wanted to do the right thing because he believed that he was the boy's biological father. Accrediting Ms. Armstrong's testimony that she told Mr. White that she did not know who the child's biological father was, Mr. White could have been attempting to establish some legally recognized relationship with the boy because he feared that his separation from Ms. Armstrong would sever his connection with Daniel. In either case, Mr. White was simply attempting to avoid the public humiliation and embarrassment that would follow the revelation that he was not the father of either of the two boys he thought were his sons. He was also seeking to establish a relationship with the boy that Ms. Armstrong could not capriciously undermine. This conduct is not the sort of fraud on the court that should prevent Mr. White from seeking prospective relief based on the irrefutable, newly discovered evidence that he is not the child's biological father.

**C.**

We turn finally to the issue of whether the irrefutable evidence that Mr. White is not Daniel's biological father provides sufficient grounds to excuse Mr. White prospectively from his support obligation. In two cases this court has upheld the use of Tenn. R. App. P. 60.02(5) to grant prospective relief from a paternity order. In one case, the person seeking

---

[9]In 1993, as now, child support decrees "remain within the court's control, so that the court may make such modifications as necessary upon a showing of a substantial and material change of circumstances." Tenn. Code Ann. § 36-5-101(a)(1) (Supp. 1998).

relief asserted that he had been fraudulently induced by the child's mother to consent to the entry of the paternity order. *See Tennessee Dep't of Human Servs. v. Johnson*, 1986 WL 1873, at *1. In the second case, the juvenile court had entered conflicting orders determining that two different men were the child's biological father. *See Johnson v. Johnson*, No. 02A01-9605-JV-00123, 1997 WL 271787, at *3 (Tenn. Ct. App. January 7, 1997) (No Tenn. R. App. P. 11 application filed).

In both cases in which this court has approved granting post-judgment relief from a paternity order, we have emphasized that "it is of overriding importance . . . that one conclusively established in law not to be the father of a child be not declared as the father of that child." *Johnson v. Johnson*, 1997 WL 271787, at *3; *Tennessee Dep't of Human Servs. v. Johnson*, 1986 WL 1873, at *5. The result in these cases is consistent with cases from other jurisdictions that have used procedures similar to Tenn. R. Civ. P. 60.02(4) to relieve a man from the prospective operation of a child support order when conclusive proof established that he was not the father of the child. *See Alabama ex rel. G.M.F. v. W.F.F.*, No. 2950647, 1996 WL 697995, at *3 (Ala. Civ. App. Dec. 6, 1996); *Crowder v. Commonwealth ex rel. Gregory*, 745 S.W.2d 149, 151 (Ky. Ct. App. 1988); *Cuyahoga Child Support Enforcement Agency v. Guthrie*, No. 72216, 1997 WL 607530, at *2 (Ohio Ct. App. Oct. 2, 1997).

Post-judgment relief in cases of this sort should not be granted without analyzing the burdens that granting relief or failing to grant relief will place on all who have an interest in the proceeding. In this case, these parties include Daniel, Mr. White, Ms. Armstrong, and the State. If relief is not granted, Mr. White will be required to support a child who is not his own. Between the present and the time the child reaches majority, Mr. White will have been required to make approximately $31,000 in support payments. He stands to lose the most financially if relief is not granted.

Ms. Armstrong, on the other hand, will lose little if prospective, post-judgment relief is granted. She is already required to provide support for Daniel to the best of her ability, and we presume that she has been currently using Mr. White's support payments to benefit him. She is apparently obtaining government assistance to assist in raising Daniel, and there is no evidence in the record that the amount of this assistance will be affected if Mr. White obtains the post-judgment relief he seeks. Should Mr. White obtain post-judgment relief, Ms. Armstrong will not be required to reimburse Mr. White for the child support he has already paid and will also be able to pursue Daniel's biological father for child support to replace the support that Mr. White will no longer be paying.

Daniel may be adversely affected if Mr. White is granted post-judgment relief because Ms. Armstrong will no longer receive support from Mr. White. However, part or all of these support payments may very well be recouped from his biological father. The boy has a legal interest in being supported by his biological father, but this interest will not be realized as long as either his mother or the State have no incentive to pursue his biological father for support. This incentive will be lacking as long as Mr. White is paying child support.

We turn finally to the State. The State has an interest in seeing to it that biological and adoptive parents support their children to the fullest extent possible and in avoiding the use of public funds to support children when their parents are able to do so. If Mr. White is granted post-judgment relief in this case, the financial burden on the State in the form of increased food stamps or AFDC benefits may increase. However, the State may be able to avoid increasing Ms. Armstrong's welfare benefits by vigorously pursuing Daniel's biological father for support as envisioned by the IV-D program. The State's interest in conserving limited welfare benefits certainly does not warrant imposing a child support obligation on a person who is not the child's biological or adoptive parent.

The State raises one final, non-monetary interest of Daniel. It asserts that the child will be adversely affected if Mr. White obtains post-judgment relief because granting relief from the juvenile court's January 5, 1994 order will result in the "bastardization" of the child.[10] Tennessee law unquestionably favors fostering relationships between a child and both of his or her biological parents. It also favors, when practicable, shielding a non-marital child from the demeaning stereotypes still attached to children whose parents are not married to each other. Under the facts of this case, however, no amount of social engineering by this court or any other court will change the fact that Daniel, and practically everyone else in his life, already knows that Mr. White is not his biological father.

Mr. White and Daniel are already estranged as a result of the separation of Mr. White and Ms. Armstrong. Granting or declining to grant Mr. White post-judgment relief from the January 5, 1994 order will not re-establish the relationship between Mr. White and Daniel. Declining to grant Mr. White post-judgment relief may very well delay or prevent Daniel from receiving support from his biological father. Accordingly, we have determined, based on the interests of all concerned, that the juvenile court should have granted Mr. White prospective relief from its January 5, 1994 order requiring him to financially support Daniel.

---

[10]We take issue with the State's choice of the term "bastardization." It carries with it negative connotations that are outmoded and inappropriate. This term no longer has a place in legal discourse, certainly not in briefs filed with this Court. In a similar vein, the General Assembly has signaled that the term "illegitimate" should no longer be included in "any legal proceeding, record, certificates, or other papers." Tenn. Code Ann. § 36-2-317 (Supp. 1998).

Accordingly, we remand the case with directions to enter an order granting Mr. White relief from the judgment from the date of his original motion seeking relief.

## III.

We reverse the order denying Mr. White relief from the January 5, 1994 judgment and remand the case to the juvenile court for further proceedings consistent with this opinion. We tax the costs of this appeal to the State of Tennessee.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:

_____
WILLIAM B. CAIN, JUDGE

_____
HENRY F. TODD, JUDGE